**UNITED STATES of America**

v.

**Louis A. KOSMA, Appellant.**

**No. 91–1423.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Oct. 16, 1991.

Decided Dec. 13, 1991.

Michael J. Kelly, Asst. Defender, Defender Ass'n of Philadelphia, Federal Court Div., Philadelphia, Pa., for appellant.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Joan L. Markman, Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

Louis A. Kosma appeals his conviction under 18 U.S.C. § 871 (1988) for making threats against then-President Ronald Reagan. His appeal alleges that the district court erred in: 1) finding that Kosma's letters to Reagan were "true threats" under Section 871 and, therefore, constitutionally unprotected speech, and; 2) construing section 871 under an objective "reasonable person" standard. We agree with the determination of the district court and will affirm.

### I

In 1988, Louis Kosma mailed a series of written communications to President Reagan and presidential assistant Marlin Fitzwater. All of these letters were of a threatening nature, some quite graphic and explicit. Although the opinion of the district court provided a thorough description of the facts, *United States v. Kosma*, 749 F.Supp. 1392 (E.D.Pa.1990), the content of Kosma's rather bizarre communications to the President are worth repeating in order to evaluate their effect on the intended audience.

Kosma's first communication with President Reagan was in a postcard postmarked March 2, 1988, which was addressed to President Reagan, "C/O Ye Ol Whitehouse." The postcard states in full:

Mr. Reagan: You are hereby invited to PHILADELPHIA. We are going to give you a 21 Gun–Salute.

21 guns are going to put bullets thru your heart & brains. You are a Disgrace to the Air–Force. You are a Disgrace to Teddy Roosevelt. You are a Disgrace to John F. Kennedy. You a Disgrace to Nancy Reagan. You have insulted her intelligence, and dignity, and honor, and integrity, and I resent this very much.!! You are In Contempt of EVERYTHING that I represent, and standby, and believe. Officially: an Act of Contempt of Court. Your name is going to be removed from ALL documents, and books. OFFICIALLY: you were NEVER the "president" of anything.!!

App. at 21–2. The return address of the postcard is "Louis A. Kosma (acting Director.FBI)."

On April 6, 1988, Kosma sent mailgrams to President Reagan, Secret Service Agent Kevin White, and Postal Service attorney Randy Levin notifying them that they were "suspended without pay ... pending a special grand jury indictment." App. at 21–5.

A document postmarked April 20, 1988 was sent to the U.S. Marshal's office in Baltimore. The document which seems to be a cut-and-paste of several other documents has the heading "IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA" and purports to be an "Official Court Order," "Official Proclamation" and "Motion to Proceed in Forma." The text of the document states:

To: Wilson Goode.
Ronald Reagan.
WHEREBY; You criminals have caused many Crimes against Humanity, and it would be Futile for you to seek Justice. YOU CAN ONLY SEEK MERCY.!! "Give me Liberty or give me Death." WE can NOT give you Liberty, but we can give you Death, to end your Mental Anguish.!! You should choose an Honorable Death. You are hereby ORDERED to Philadelphia, Penna. We are going to give you a 21 Gun–Salute. *Twenty-one guns are going to put bullets thru your heart & brains.* Place: FEDERAL COURTHOUSE. 601 Market street. Time: 6:O'clock am. Date: June 14th. 1988. Flag Day.

App. at 21–4 (emphasis in original). The document claims to be from the "Senior Commander. REGIONAL TASK FORCE" and the "U.S. MARINES," but is signed by Kosma.

Four letters, all postmarked July 4, 1988, were sent separately to presidential assistant Marlin Fitzwater. The first letter states:

To: President Reagan
Stevan P. White (Henchman) (in Phila).
Official Death Sentence
O. D. S.
Because of your crimes against humanity, accessories to the actual fact, aiding and abetting several felonies. O.D.S: July 14th, 1988. Potassium–Cyanide Gas.

App. at 21–9. The letter is signed by the "Hon. Peter Scuderi, Hon. Conrad Syr, Hon. Stephan Rinehardt."[1] The second letter, also directed at President Reagan, states that "you are officially sentenced to death, by potassium-cyanide gas pellets. The impeachment is too lienient for you." App. at 21–12. This letter is signed by Kosma. The third letter, an "official death sentence" and "warrant" for President Reagan, calls the President "Lucifer" and "Saten" and lists a series of criminal charges against the President. App. at 21–14, 21–15. This letter is purportedly signed by Scuderi, Syr, and Rinehardt. The fourth letter seems to be a continuation of the criminal charges against President Reagan.

Finally, a letter postmarked July 5, 1988 was sent to Fitzwater:

To: Marlin Fitzwater

You should not have intercepted the postcard meant for Reagan. He doesn't know that he is sentenced to death, and should get his affairs in order.

\* \* \*

Reagan cannot seek justice. Reagan can only seek mercy. In order to break the Republican conspiracy, and since the impeachment is much too lienient, Reagan is sentenced to death.

\* \* \*

Furthermore; Reagan has been suspended without pay, or pension, or pecuniary gain, incidental or otherwise, since April 6th. 1988. No if's, and's or but's!! Now tell him!! Also sentenced to death is: Stevan P. White (Reagan's henchman) (in Phila)

App. at 21–20, 21–21.

In June 1988, Kosma was arrested and charged with two counts of making threats on the life of the President of the United

---

1. Kosma appears to be referring to United States Magistrate Judge Peter B. Scuderi, and United States Circuit Judges Conrad K. Cyr and Stephen Reinhardt.

States in violation of 18 U.S.C. § 871.[2] In October 1988, the government moved to dismiss the complaint against Kosma without prejudice. This motion was premised upon Kosma's agreement to receive in-patient psychiatric care. Kosma violated the terms of the agreement, and the charges were reinstated in November 1989. Despite the threatening nature of all the letters, Kosma was only charged under section 871 for the letters postmarked March 2, 1988 and April 20, 1988.

While incarcerated and awaiting trial, Kosma sent the following letter postmarked May 10, 1990 to former President Reagan:

Dear Mr. Reagan,

You are invited to Phila, Penna. You are invited to an act of EUTHANASIA. You are invited to a 21 gun salute. 21 guns are going to blow holes in your heart and brain. You should pick an honorable way to die. You are a disgrace to your wife Nancy. You are a disgrace to the U.S. of A. You are all mouth except your ass, and that sucks canal water. If brains were dynamite, you couldn't blow your nose. You are an incorrigable, incurable, loathsome scum of the earth. How the fuck did you get to be president anyway? What are you going to do with $7,000,000 from that publisher? Why did you take an il-legal tax-rebate of $23,600 1985 1986?

I'm signing off.

10–04

Aufwiedersein,
Louis A. Kosma

App. 21–7. Kosma was then indicted on a third count of making a threat on the life of a former President of the United States in violation of 18 U.S.C. § 879 (1988).[3]

In a non-jury trial in November 1990, the district court found Kosma guilty of violating section 871 (threats against the president) under an objective, reasonable person standard. However, the court found Kosma not guilty of violating section 879 (threats against a former president). Although the nature of Kosma's threat under section 879 was similar to the two threats under section 871, the district court found that the test for section 879 was more strict than that for Section 871.[4] The court relied on a House Judiciary Committee report which interpreted section 879 as requiring proof that "the statement could reasonably be perceived as a threat" and "the maker intended the statement to be a threat."[5] *Kosma*, 749 F.Supp. at 1401 (quoting H.Rep. No. 725, 97th Cong., 2d Sess. 3–4, U.S.Code Cong. & Admin.News 1982, pp. 2624, 2626). The district court found that psychiatric testimony presented at trial indicated that Kosma did not intend his May 10, 1990 letter to be a threat. Kosma was subsequently sentenced to prison for twenty-one months and supervised release for three years.

2. Section 871 provides in pertinent part:
   (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States ... or knowingly and willfully otherwise makes any such threat against the President ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. Section 879(a) provides in pertinent part:
   (a) Whoever knowingly or willfully threatens to kill, kidnap, or inflict bodily harm upon—
      (1) a former President or a member of the immediate family of a former President;

   .      .      .      .      .      .

   shall be fined not more than $1,000 or imprisoned not more than three years, or both.

4. The government does not appeal the district court's interpretation of section 879, and we express no opinion as to the district court's interpretation.

5. Although the district court's opinion does not explain why section 879 should be treated differently from section 871, there is arguably less reason to be concerned from a national security standpoint when a threat is made against a former President than when it is made against a current President.

Kosma appeals from his conviction under section 871. Because this appeal involves the interpretation of a statute and its application to the facts of this case, our review is plenary. *Ortiz v. Eichler*, 794 F.2d 889, 891 (3d Cir.1986); *see also Bose Corp. v Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984) ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'") (citation omitted).

## II

■ Kosma argues that his letters to the President, though crude, offensive and inane, do not constitute "true threats," because they represent protected political speech under the First Amendment. He contends that the letters were merely his unique way of commenting on President Reagan's fitness for office and his Administration's policies.[6] At the outset, we recognize that the First Amendment was meant to encompass not only learned political discourse but also vituperative verbal and written attacks on the President and other high government officials. *See Osborne v. Ohio*, 495 U.S. 103, ——, 110 S.Ct. 1691, 1717, 109 L.Ed.2d 98 (1990) (Brennan, J., dissenting) ("When speech is eloquent and the ideas expressed lofty, it is easy to find restrictions on them invalid. But were the First Amendment limited to such discourse, our freedom would be sterile indeed."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964) ("debate on public issues should be uninhibited, robust and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly

sharp attacks on government and public officials"). However, in enacting section 871, Congress made a conscious decision that certain types of speech which are directed against the President, namely those of a threatening nature, are punishable. *See Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence."). We are mindful of the potential difficulties in distinguishing between constitutionally protected political speech and unprotected threats against the President. *See United States v. Crews*, 781 F.2d 826, 832 (10th Cir.1986) ("[A] compelling government interest in protecting the President justifies imposition of criminal liability when it is reasonably clear that the defendant was not engaged in political advocacy.") (citation omitted). Our solicitude for the First Amendment notwithstanding, this case is not a difficult one.

Kosma relies on *Watts* to support his argument that the government must prove that the defendant's statements constitute a "true threat" in order to fall within the realm of unprotected speech. 394 U.S. at 708, 89 S.Ct. at 1401–02. In *Watts*, the Supreme Court overturned the conviction of an eighteen-year-old Vietnam War protester who said: "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers." *Id.* at 706, 89 S.Ct. at 1401. The Court found this statement to be mere "political hyperbole," and "a kind of very crude offensive method of stating a political opposition to the President." *Id.* at 708, 89 S.Ct. at 1402. The appropriateness of such statements about the President must be viewed "in context,

---

**6.** Kosma does not argue that his letters were so ridiculous that they could not possibly be considered true threats. Had he made such an argument, the result in this case would not be different. As the Court of Appeals for the Ninth Circuit has stated:

    Although it is true that a series of bizarre remarks may tend to lower a person's credi-

bility, potential assassins may well be irrational. Hence, to dismiss threats merely because a person expresses himself in an outlandish, illogical manner may defeat § 871's purpose of apprehending people who potentially pose a threat to the President.

*United States v. Mitchell*, 812 F.2d 1250, 1256 (9th Cir.1987).

and regarding the expressly conditional nature of the statement and the reaction of the listeners." *Id.* Kosma's letters clearly do not satisfy any of these three criteria.

First, there was no overtly political context for Kosma's letters. In *Watts,* the defendant made his statement on the grounds of the Washington Monument during a political rally in which police brutality was being discussed. Kosma mailed his letters unsolicited to the President. The content of his letters reveals an interest in political advocacy which is questionable at best. Second, Kosma's threats, though ostensibly phrased as "invitations," were not as conditional as those in *Watts,* which were dependent on the defendant's induction into the armed forces—a condition which the defendant stated would never happen.[7] In contrast, Kosma specified the precise date, time and place for the President's "21 gun salute."[8] *See United States v. Callahan,* 702 F.2d 964, 966 (11th Cir.1983) (specification of date, time and place are factors in determining whether statement is "true threat"). Third, the defendant in *Watts* directed his remarks at a group attending a W.E.B. DuBois Club rally; this group laughed after the defendant made his statement about President Johnson. Because Kosma sent his letters directly to the President, the only audience for them was the Secret Service and the staff of the White House mailroom, and it is doubtful that they were laughing. *See United States v. Hoffman,* 806 F.2d 703, 712 (7th Cir.1986) ("The immediate response of the [White House] mail-room employee and the Secret Service to the content of [defendant's] letter is clear evidence of the seriousness the recipients of the letter attached to the expression of the intent to harm the President."), *cert. de-*

*nied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987).

This case is distinguishable from *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), in which McPherson, a deputy constable, was discharged for remarking after hearing of the 1981 assassination attempt on President Reagan, "If they go for him again, I hope they get him." *Id.* at 380, 107 S.Ct. at 2894. The Court found that McPherson's statement dealt with matters of public concern, since it was made in the context of a conversation about how the President's policies concerning medicaid, food stamps, welfare, and CETA affected blacks. *Id.* at 381, 386, 107 S.Ct. at 2895, 2897–98. It would be a stretch to say that Kosma's letters deal with *any* matter of public concern. The March 2, 1988 letter is nothing more than a series of incoherent rantings: "You are a Disgrace to the Air–Force. You are a Disgrace to Teddy Roosevelt. You are a Disgrace to John F. Kennedy. You are a Disgrace to Nancy Reagan." App. at 21–2. There is no logical connection between the Air Force, the two former Presidents, and the President's wife, nor is there any explanation how President Reagan "disgraced" them. The April 20, 1988 "court order" accuses the President of committing "Crimes against Humanity," but provides no explication of those crimes. App. at 21–4. It is also significant that Kosma's letters implied that Kosma *himself* would be the person who would kill the President, while McPherson's statement merely expressed a desire that *another person* kill the President.

Courts of appeals which have examined alleged threats against the President since *Watts* have found a wide range of threats to be unprotected expression. *See United States v. Smith,* 928 F.2d 740, 744 (6th Cir.)

---

7. The defendant in *Watts* prefaced his alleged threat with this statement: "And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. *I am not going." Watts,* 394 U.S. at 706, 89 S.Ct. at 1401 (emphasis added).

8. Even if Kosma's threats were truly conditional, they could still be considered true threats. *See United States v. Howell,* 719 F.2d 1258, 1260

(5th Cir.1983) (hospital patient's statement that he would kill the President if released is a true threat), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Callahan,* 702 F.2d 964, 965 (11th Cir.) (letter offering to kill the President if Secret Service could make arrangements is a true threat), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983).

("Some one ought to Take [the President] OUT AS IN 'Death'"), *cert. denied,* — U.S. —, 112 S.Ct. 159, 116 L.Ed.2d 124 (1991); *United States v. Manning,* 923 F.2d 83, 84 (8th Cir.) ("You can't keep me from killing George Bush; One day I will have my chance, just watch and see."), *cert. denied,* — U.S. —, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *United States v. Mitchell,* 812 F.2d 1250, 1252 (9th Cir.1987) (threatening remarks interspersed with claims that defendant was Gandhi and had a guerilla army in the Philippines); *Crews,* 781 F.2d at 829 ("If Reagan came to Sheridan [Wyoming], I would shoot him."); *United States v. Merrill,* 746 F.2d 458, 461 (9th Cir.1984) (letters contained bloody depictions of Reagan's head with the words "Kill Reagan"), *cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985); *United States v. Welch,* 745 F.2d 614, 616 (10th Cir.1984) ("If Reagan was here, I would shoot him. I wouldn't make the same mistake as Hinckley did."), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1364, 84 L.Ed.2d 384 (1985); *United States v. Howell,* 719 F.2d 1258, 1260 (5th Cir.1983) ("It's too bad that John Hinckley did not get him. I will kill the President if I get a chance."); *Callahan,* 702 F.2d at 965 ("It is essential that Reagan and Bush are assassinated on Inauguration Day.... If [the Secret Service] can arrange for me to get into the act, I will be willing to accept the responsibility."); *United States v. Frederickson,* 601 F.2d 1358, 1362 (8th Cir.) ("I am going to blow them all up.... I start with the President and go down."), *cert. denied,* 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979).

Even in the context of this extraordinary litany of threats, Kosma's letters are exceptional. In all of the cases cited above, the threats against the President were made to third persons, such as mental health professionals (*Crews, Howell, Welch*) and law enforcement officials (*Callahan, Frederickson, Mitchell*), whereas Kosma sent his March 2, 1988 letter straight to President Reagan at the White House. In doing so, Kosma directed his threat at the exact person whom Section 871 was designed to protect. Indeed, Kos-

ma went even further than the defendant in *Hoffman,* who sent a letter to the White House which read: "Ronnie, Listen Chump! Resign or You'll Get Your Brains Blown Out." *Hoffman,* 806 F.2d at 704. Kosma's April 20, 1988 letter to the U.S. Marshal's office in Baltimore specified the exact time, date, and place for the "21-gun salute." Because of the focused nature of Kosma's letters, a greater level of seriousness and malevolence could be ascribed to his threats.

Whether a speaker's language constitutes a threat is a matter to be decided by the trier of fact. *United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982); *see also Merrill,* 746 F.2d at 462–63 ("A few cases may be so clear [in favor of acquittal] that they can be resolved as a matter of law, but most cases arising under [Section 871] present widely varying fact patterns that should be left to the trier of fact.") (citations omitted). Therefore, the district court's findings are entitled to great deference by this court, tempered by our obligation of "independent review" because First Amendment protections are implicated. *See Bose,* 466 U.S. at 499, 104 S.Ct. at 1958–59. In sum, we find that Kosma's letters to the President clearly constituted "true threats" and were not protected expression. Even if Kosma's letters somehow furthered public debate on the workings of our government, we would still conclude that their marginal political value was outweighed by the compelling national interest in protecting the Chief Executive.

### III

The more complicated issue in this case is the appropriate intent standard for judging a "true threat" against the President. Section 871 specifies that a threat must be made "knowingly and willfully." First, we will examine the "willfully" element since its interpretation is contested in this case. Then, we will examine the "knowingly" element, which Kosma does not contest. We acknowledge the difficulty of defining the two elements separately, especially

since they are so often paired together in statutes.[9] Yet, in the context of section 871, we believe each term has a distinct meaning.

### A

■ Other courts of appeals which have interpreted the "willful" element of section 871 have chosen between a subjective and an objective standard. The less-favored, subjective standard construes "willfully" to require proof that the defendant "made the alleged threat with specific intent to execute it." *Watts v. United States,* 402 F.2d 676, 691 (D.C.Cir.1968) (Wright, J., dissenting), *rev'd,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam).[10] This test, which Kosma advocates, has been adopted by only the Court of Appeals for the Fourth Circuit. *United States v. Patillo,* 438 F.2d 13, 16 (4th Cir.1971) (en banc) (requiring "a present intention either to injure the President, or to incite others to injure him, or to restrict his movements"); *cf. Rogers v. United States,* 422 U.S. 35, 48, 95 S.Ct. 2091, 2099, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring) (interpreting section 871 to require a showing that "the speaker intended his statement to be taken as a threat, even if he had no intention of actually carrying it out"). This standard is similar to the standard used to judge threats under section 879.

A subjective test is problematic for two reasons. First, a subjective test makes it considerably more difficult for the government to prosecute threats against the President. While this might be tolerable in other contexts, the compelling, and indeed paramount, interest in safeguarding the President dictates otherwise. During the House debate on H.R. 15314, which became section 871, one of the bill's sponsors explained that "the Chief Executive of a great Nation like ours ought to be protected *in every way possible,* especially in view

of the sad experience we have had in losing by assassination three of our beloved Presidents." 53 Cong.Rec. 9378 (1916) (emphasis added) (statement of Rep. Webb). The safety of the President could be seriously compromised by a standard which depends solely on an evaluation of the threatmaker's intent.

A subjective test is also problematic since it defies the purposes behind the Congressional enactment of section 871. Not only is this statute meant to protect the President's life, but it is also meant to prevent the disruptions and inconveniences which result from the threat itself, regardless of whether there is any intention to execute the threat. The House Report which accompanied the bill stated: "It is the first and highest duty of a Government to protect its governmental agencies, in the performance of their public services, from threats of violence which would tend to coerce them or *restrain them in the performance of their duties.*" H.R.Rep. No. 652, 64th Cong., 1st Sess. 1 (1916) (emphasis added). As Justice Marshall explained in his concurring opinion in *Rogers:*

> Plainly, threats may be costly and dangerous to society in a variety of ways, even when their authors have no intention whatever of carrying them out. Like a threat to blow up a building, a serious threat on the President's life is enormously disruptive and involves substantial costs to the government. A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President.

422 U.S. at 46–47, 95 S.Ct. at 2098. Consequently, this subjective test has been either explicitly or implicitly rejected by numerous courts of appeals. *See Kosma,* 749

---

**9.** Our research has uncovered more than 150 provisions of the United States Code which use the phrase "knowingly and willfully." *See, e.g.,* 15 U.S.C. § 2070(a) (1988) (failure to comply with consumer protection laws); 18 U.S.C. § 545 (1988) (smuggling goods into U.S.); 18 U.S.C. § 1701 (1988) (obstruction of mails).

**10.** Although the Supreme Court reversed the D.C. Circuit's decision in *Watts,* it left undecided the issue of whether the defendant must have intended to carry out his threat in order to be prosecuted. *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401–02.

F.Supp. at 1399 (list of cases rejecting Fourth Circuit's analysis).

In contrast to this subjective test, the Courts of Appeals for the Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits have adopted an objective, reasonable person test,[11] which requires that

the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein *a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President,* and that the statement not be the result of mistake, duress, or coercion. *The statute does not require that the defendant actually intend to carry out the threat.*

*Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir.1969) (emphasis added); *see Manning,* 923 F.2d at 86 (Eighth Circuit); *Hoffman,* 806 F.2d at 711–12 (Seventh Circuit); *Callahan,* 702 F.2d at 965 (Eleventh Circuit); *United States v. Vincent,* 681 F.2d 462, 464 (6th Cir.1982); *United States v. Hart,* 457 F.2d 1087, 1090 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972). We believe the objective, reasonable person standard is the correct standard, and we will adopt it as the law of this circuit.

The reasonable person standard best satisfies the purposes of section 871, since it recognizes the power of a threat to hinder the President and his aides in the performance of their duties, even when the threat-maker has no intention of carrying out the threat and there is no actual danger to the President. *See United States v. McCaleb,* 908 F.2d 176, 179 (7th Cir.1990) (under section 871, not necessary that President "be harmed or made aware of the threat"); *Roy,* 416 F.2d at 877 ("detrimental effect upon Presidential activity and movement

... may result simply from a threat upon the President's life"). As the Court of Appeals for the Eighth Circuit recently noted, "[t]he *threat alone* is disruptive of the recipient's sense of personal safety and well-being and is the true gravamen of the offense." *Manning,* 923 F.2d at 86 (emphasis added). When that intended recipient is the President of the United States, a threat sets in motion an entire army of Secret Service agents and law enforcement officials who must investigate the threat, take additional safety precautions to protect the President, and in extreme cases, alter the President's schedule. The larger risks to the country's national security are obvious. *See Roy,* 416 F.2d at 877 ("A President's death in office has worldwide repercussions and affects the security and future of the entire nation."). Thus, the threat itself constitutes a form of a violence which should be discouraged. *See United States v. Poff,* 926 F.2d 588, 591 (7th Cir.) (en banc) (threat against President is "crime of violence" under Sentencing Guidelines), *cert. denied,* — U.S. —, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). In short, we believe that section 871 was intended to criminalize the mere utterance of a true threat, rather than the defendant's intention to carry out the threat.

As to the specific facts of this case, the evidence presented at trial was more than sufficient to convict Kosma under the reasonable person standard. Kosma's letters paint a picture of a very disturbed individual who seems both capable of and inclined to do harm to the President. The fact that his March 20, 1988 letter was sent directly to the President at the White House indicates the focused nature of his threat. Indeed, Kosma conceded to the district court that his letters "contain statements that *could* be, if not would be, interpreted by a reasonable person as a 'serious expression of an intention'" to harm the President. *Kosma,* 749 F.Supp. at 1400 n.

---

**11.** The Court of Appeals for the Second and Fifth Circuits have not expressly adopted a reasonable person standard, although they have adopted objective tests. The Second Circuit has held that "it is not necessary to establish defendant's intent to carry out his threat." *Carrier,*

672 F.2d at 306. The Fifth Circuit has held that a threat "is willfully made if the maker voluntarily and intelligently utters the words in an apparent determination to carry out the threat." *Howell,* 719 F.2d at 1260.

8 (emphasis in original). Kosma does not claim that his letters were merely a harmless prank. Even if this were the case, the threats would still be judged from the standpoint of whether a reasonable person would perceive them as idle threats. *See Roy*, 416 F.2d at 878 ("To say that it is no defense to claim that the threat was made as a joke is an overstatement.").

## B

■ Most courts of appeals which have examined section 871 either have not considered the "knowingly" element of section 871 or have collapsed it into the "willfully" element. As this is a case of first impression in this court, we will analyze the "knowingly" element separately in order to provide guidance to the district courts.

In criminal cases, juries are typically instructed that "[a]n act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." 1 Edward J. Devitt and Charles B. Blackmar, *Federal Jury Practice and Instructions* § 14.04 (1977). Although the Ninth Circuit did not expressly address the "knowingly" element in *Roy*, it implicitly recognized this element when it noted that a threat must be made intentionally and "not be the result of mistake, duress, or coercion." *Roy*, 416 F.2d at 877–78. We think this Ninth Circuit construction of "knowingly" as it is used in section 871 is correct, and we will adopt it.

The alternative to the Ninth Circuit definition is a more subjective definition of "knowingly." Justice Marshall, for example, would require the government to prove that "the defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one." *Rogers*, 422 U.S. at 46, 95 S.Ct. at 2098 (Marshall, J., concurring). Two other courts have adopted variations of this subjective "knowingly" standard. The Court of Appeals for the Eleventh Circuit has required proof that the defendant "understood the meaning of the words to be an apparent threat." *Callahan*, 702 F.2d at 965. Similarly, the Court of Appeals for the Fifth

Circuit has stated that "a threat is knowingly made if the maker comprehends the meaning of the words uttered." *Howell*, 719 F.2d at 1260.

As our discussion of "willfully" suggested, any subjective test potentially frustrates the purposes of section 871—to prevent not only actual threats on the President's life, but also the harmful consequences which flow from such threats. Although a subjective "knowingly" standard would probably not open the floodgates to threats against high government officials, it would make prosecution of these threats significantly more difficult. We are wary of the potential for persons making threats to hide behind the defense that they did not understand their words to be a threat. In contrast, construing a "knowing" threat as a threat which is not the result of mistake, coercion or duress would only excuse a few exceptional cases. *See* 53 Cong.Rec. 9379 (1916) (statement of Rep. Volstead) (only "intentional" threats are proscribed "so as not to make innocent acts punishable"). For instance, section 871 would not punish a person who writes a threatening letter to the President and places it in his desk with no intention of sending it, yet later finds that a family member has accidentally mailed the letter. Nor would the statute punish a non-English speaker who unwittingly reads aloud a threatening statement in English, which he does not know to be a threat. While it is true that unfortunate consequences would flow from such "accidental" threats, since the Secret Service must investigate all threats, legitimate or not, a statute of this nature cannot proscribe conduct which is undertaken without a mens rea. *See Morissette v. United States*, 342 U.S. 246, 275, 72 S.Ct. 240, 255–56, 96 L.Ed. 288 (1952) (cannot presume that intent is not element of offense).

■ As for the application of the "knowingly" standard to this case, the district court refused to adopt a subjective standard along the lines of the Fifth Circuit's test in *Howell*. *Kosma*, 749 F.Supp. at 1400 n. 7. The district court noted further that "if I were to adopt the *Howell* formulation, it would not change the result in this

case," since a psychiatric examination of Kosma indicated that Kosma "understood both the meaning of the words he used in his statements and the concept of threat." *Id.* Because the district court found that Kosma did not meet the more lenient Fifth Circuit test, it is logical to conclude that he also does not meet the more rigorous test that we set forth here. Furthermore, there is no evidence that Kosma's threats were the result of mistake, accident, coercion, duress, or some other innocent reason. In fact, Kosma's July 5, 1988 letter to Marlin Fitzwater states that "[y]ou should not have intercepted the postcard meant for Reagan." App. at 21–20. Clearly, Kosma did not accidentally mail his letters; he wanted them to be read by the President and his aides.

### IV

Any threat against a government official must be taken seriously. A threat against the President is of paramount importance because of its potential impact on national security. Within the constraints of the First Amendment, courts are bound by section 871 to discourage and punish such threats. An objective, reasonable person construction of section 871 is the best way to prevent the many harmful consequences which flow from threats against the President.

For the reasons set forth above, we will affirm the judgment of conviction.