

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-2009

# USA v. D'Amario

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2400

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. D'Amario" (2009). *2009 Decisions*. Paper 1252.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1252

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

NOS. 06-2400 and 07-1955

_____

UNITED STATES OF AMERICA

v.

ARTHUR D'AMARIO, III,
                                                  Appellant

_____

On Appeal From the United States
District Court
For the District of New Jersey
(D.C. Crim. Action No. 06-cr-00112)
District Judge:  Hon. Paul S. Diamond

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)

May 22, 2009

BEFORE:  RENDELL, STAPLETON and ALARCON,*
*Circuit Judges*

(Opinion Filed: June 2, 2009)

_____

*Hon. Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting
by designation.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellant Arthur D'Amario was convicted under 18 U.S.C. § 115(a)(1)(B) and (2) of knowingly and willfully threatening to assault, kidnap, and murder a United States judge, with intent to impede, intimidate, and interfere with such judge while engaged in the performance of official duties, and with intent to retaliate against such judge on account of the performance of official duties. D'Amario moved for a judgement of acquittal pursuant to Fed. R. Crim. P. 29 and for a new trial pursuant to Fed. R. Crim. P. 33. The District Court denied the motion and sentenced D'Amario to a prison term of 84 months and supervised release of three years. This appeal followed.[1]

The appeal presents four principal issues. First, we must determine whether the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that D'Amario knowingly and willfully threatened a federal judge with the intent to interfere with such judge while engaged in the performance of official duties. We conclude that it

---

[1] Prior to D'Amario's trial, he appealed from an order requiring that he undergo a mental competency examination (No. 06-2400). That appeal was subsequently consolidated with his appeal from conviction (No. 07-1955). Appeal No. 06-2400 is moot and will be dismissed for mootness.

2

was. Second, we must determine if the District Court abused its discretion by admitting evidence of other bad acts under Fed. R. Evid. 404(b). We conclude that it did not. Third, we must determine if the District Court's jury instructions constitute plain error. We conclude that they do not. Finally, we must determine if the District Court abused its discretion in determining that the prosecutor did not engage in misconduct in the closing statements. We conclude that it did not.

## I.

While serving a sentence at the Federal Correctional Institution in Fort Dix, New Jersey for his 1999 conviction in the United States District Court of Rhode Island, D'Amario wrote a threatening letter to the Honorable Joseph A. DiClerico, Jr., the district court judge who had presided over his trial and sentencing in Rhode Island. As a result, D'Amario was prosecuted and convicted in 2001, in the District of New Jersey, for violating 18 U.S.C. § 115(a)(1)(B) by threatening the life of a United States judge. *See United States v. D'Amario*, 350 F.3d 348 (3d Cir. 2003). The Honorable Joseph E. Irenas presided over this trial.

In January 2006, while serving a prison sentence for this conviction at the Federal Medical Center Prison in Springfield, Missouri, D'Amario mailed documents to the District Court in New Jersey. The documents were mailed in contemplation of his release from prison on February 10, 2006 to a halfway house to serve a time of supervised release. D'Amario did not want to spend further time on supervised release at a halfway

house.  D'Amario believed that if he served an additional thirty days in prison, he would

"max out" and his federal custody would terminate.  He also believed that the court had

the authority to revoke his supervised release and modify his sentence.

On January 13, 2006, D'Amario mailed these documents bearing his signature, one

captioned "Motion to Revoke Supervised Release" and an accompanying

"Memorandum," from the prison to the Office of the Clerk of the Court in Camden, New

Jersey.   In the Memorandum, D'Amario stated, *inter alia*, that:

> Defendant is serving sentences imposed in the districts of Rhode Island and New Jersey.  His concurrent s.r. revocation terms will expire Feb. 10, 2006, on which date he'll have served 23 months of violation time. . . . [H]e can only be sentenced to one more month upon a third revocation. . . . If discharged on Feb. 10, he will violate the same day.
>
> Fourteen months ago, upon finding that Defendant is violent, dangerous, schizophrenic, and determined to get a gun, Judge Smith employed § 3583(e)(2) to revoke/modify his supervised release while he was still in prison and 3 days from release. . . .  Clearly, this court has authority to revoke the imminent supervision and alter the sentence.
>
> The court should heed the warning of Justice Alito in *U.S. v. D'Amario*, 350 F.3d 348 (3d Cir. 2003), that Defendant is extremely dangerous.  Changing his sentence to a max-out term will provide the medical staff at Springfield more time to prepare a § 4246 certificate. Judge Irenas heard testimony on Nov. 29, 2001, from a psychiatric expert that Defendant is insane.  His own RI lawyer, Ed Roy, told the Court Defendant is "mentally incompetent."
>
> He will not serve probation.  He will not take orders from federal judges and probation officers.  It is safer to revoke his supervision now, and extend his detention, than to speculate on how this "schizophrenic" who passionately hates NJ judges will react to sudden liberty on Feb 10. . . .

SA508.

On January 17, 2006, the Motion and Memorandum were received and filed by the

4

Clerk and reviewed by Judge Irenas. Judge Irenas immediately informed the United States Marshals Service and requested a threat assessment, which the Marshals conducted. Subsequently, Judge Irenas had the Marshals Service install a security system in his home.[2]

On February 14, 2006, a federal grand jury sitting in Newark, New Jersey, returned a single-count indictment charging D'Amario with knowingly and willfully threatening to assault, kidnap, and murder a United States judge, with intent to impede, intimidate, and interfere with such judge while engaged in the performance of official duties, and with intent to retaliate against such judge on account of the performance of official duties, in violation of 18 U.S.C. § 115(a)(1)(B) and (2). A1. On December 15, 2006, after a five day trial presided over by the Honorable Paul S. Diamond, the jury found D'Amario guilty. On March 26, 2007, Judge Diamond sentenced D'Amario to 84 months of imprisonment and three years of supervised release.

D'Amario moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 and

---

[2]D'Amario argues that this is a false statement of fact. Ltr. to Clerk of Court, April 24, 2009, Supp. *Pro Se* Br. He submits a document entitled "The United States Marshals Service Judicial Security Process," dated September 2007, as evidence that Judge Irenas had a security system installed in 2005, not in 2006 in response to D'Amario's letter. The relevant section of the document discusses home alarms for federal judges. The document states that on June 14, 2005, the Administrative Office of the United States asked all federal judges whether they wanted an alarm system installed in their homes. It states that approximately 1,600 of the 2,200 judges requested alarm systems. Nowhere, however, does it state that Judge Irenas was one of those judges. This evidence does not contradict or call into question the evidence presented at trial that Judge Irenas requested an alarm system after receiving D'Amario's letter.

for a new trial pursuant to Fed. R. Crim. P. 33.  The District Court denied the motions.

II.

A.  Sufficiency of the Evidence

We apply a deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence.  We view the evidence in the light most favorable to the government, and will sustain the verdict if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir.), *cert. denied*, 519 U.S. 1047 (1996) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  We do not weigh the evidence or determine the credibility of the witnesses.  *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998).  "Thus, 'a claim of insufficiency of the evidence places a very heavy burden on an appellant.'"  *Id*. (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990)).

D'Amario's conviction under 18 U.S.C. § 115(a)(1)(B) and (2) required that the Government prove: (1) D'Amario threatened to assault or murder; (2) a federal judge; (3) with the intent to impede, intimidate, interfere with, or retaliate against that judge, on account of the judge's performance of official duties.  *See* 18 U.S.C. § 115(a)(1)(B), (2); *United States v. Stewart*, 420 F.3d 1007, 1015 (9th Cir. 2005).

The Supreme Court has created the "true threat" standard to determine whether a statement is First Amendment-protected or constitutes a crime.  *See Watts v. United States*, 394 U.S. 705, 707 (1969).  In the context of a conviction under § 871 for

6

threatening the President's life, we concluded that an utterance is a "true threat" if:

> the defendant intentionally make[s] a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of the President, and [if] the statement [is not] the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*United States v. Kosma*, 951 F.2d 549, 557 (3d Cir. 1991) (citation omitted). Our decision in *Kosma* clearly laid out the rationale for this finding. *Id*. at 556. We have applied this same "objective listener" standard to determine whether a mailing was a "true threat" under § 876. *See United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004); *see also United States v. Davila*, 461 F.3d 298, 304-05 (2d Cir. 2006); *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990); *Martin v. United States*, 691 F.2d 1235, 1240 (8th Cir. 1982). We have yet to apply it in the context of a conviction under § 115; however our sister Circuits have done so. *See, e.g.*, *United States v. Martin*, 163 F.3d 1212, 1216 (10th Cir. 1998); *United States v. Malik*, 16 F.3d 45, 49-50 (2d Cir. 1994); *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990).

Viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found that D'Amario's conduct met the essential elements of a § 115 offense. D'Amario does not dispute that he sent the Memorandum to Judge Irenas, nor does he dispute that Judge Irenas is a federal judge. D'Amario disputes that the Memorandum was a threat; he contends that the Memorandum was sarcastic and was

7

intended to be sarcastic.

The Memorandum on its face was unquestionably threatening. As the District Court noted, "D'Amario urged Judge Irenas to 'heed' his 'warning' that unless the Judge 'revoked' D'Amario's supervised release, on February 10, 2006, D'Amario – who 'passionately hates NJ judges,' and is 'extremely dangerous' and 'violent' – would 'get a gun' and 'violate the same day.'" SA514. Even if the Memorandum was not unquestionably threatening, the language was such that a rational trier of fact could clearly conclude that it was threatening.

When evaluating whether statements constitute a "true threat," the statements "must be viewed 'in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners.'" *Kosma*, 951 F.2d at 553-54 (quoting *Watts*, 394 U.S. at 708). As for the context, the Court determined that the Government showed that Judge Irenas was familiar with D'Amario's criminal record, knew he had been convicted of crimes involving weapons and violence, had twice before violated supervised release, and had previously threatened to murder a federal judge. As to the evidence of Judge Irenas's reaction, the Government showed that Judge Irenas became concerned and summoned the Deputy Marshal who, at Judge Irenas's request, conducted a threat assessment of the Memorandum. Shortly after receiving the Memorandum, Judge Irenas had a security system installed in his home. Presented with this evidence, a rational trier of fact could determine that a reasonable person in D'Amario's position

8

would foresee that the statements would be interpreted by Judge Irenas as a serious expression of an intention to inflict bodily harm.

The evidence was sufficient to show that D'Amario threatened to obtain a gun and kill Judge Irenas if he did not revoke his supervised release, and therefore the Government proved all three elements of § 115. As for D'Amario's contention that the Memorandum was sarcastic and could not constitute a threat, we agree with the District Court that it was within the jury's province to reject that characterization of the Memorandum. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 700 (3d Cir. 1995) ("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it.") (quoting *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987), *cert. denied*, 488 U.S. 1004 (1989)).

D'Amario argues that the Government's case was "substantially weakened" because it did not call Judge Irenas as a witness. According to D'Amario, the Memorandum was not threatening but rather sarcastic, and therefore, the jury could not properly convict him unless it heard from the "victim" himself that he felt threatened by the Memorandum. The Government was not required to call the actual threat recipient to testify because the "true threat" test is not dependent upon the subjective response of the recipient, but rather whether a reasonable recipient familiar with the content and context of the letter would interpret it as a threat. *See Roberts*, 915 F.2d at 891 ("While a relevant

9

consideration is whether an ordinary reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury, there is no requirement that the actual recipient testify.") (internal quotation marks and citation omitted).  Because the evidence presented was sufficient for a rational trier of fact to conclude that Judge Irenas would interpret the statements as serious expressions to inflict harm, the Government's case was strong enough to support the conviction without the testimony of Judge Irenas.

### B.  Admission of Evidence of Criminal History

Fed. R. Evid. 404(b) provides in relevant part that: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . . ."  We have recognized that Rule 404(b) is a rule of inclusion rather than exclusion, and we favor the admission of evidence of other crimes, wrongs, or acts if such evidence is "'relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.'"  *United States v. Cruz*, 326 F.3d 392, 395 (3d Cir. 2003) (quoting *United States v. Long*, 574 F.2d 761, 765 (3d Cir. 1978)).

Federal Rule of Evidence 403 provides in relevant part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ."

The court conducts a four-part test to determine whether evidence is admissible under Rules 403 and 404(b): "(1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." *Id.* (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). We review the district court's decision to admit evidence of prior "bad acts" for abuse of discretion. *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992) (citation omitted). We find that all four requirements for admission of Rule 404(b) evidence were met.

The District Court permitted the Government to present evidence of D'Amario's criminal history for three limited purposes: (1) to establish that the Memorandum was a "true threat"; (2) to prove D'Amario's criminal intent; and (3) to show D'Amario's motive in sending the Memorandum to Judge Irenas. SA517.

As to the purpose of establishing a true threat, the jury was required to determine whether a reasonable person in Judge Irenas's position would have viewed the Memorandum as a threat. The Court noted that Judge Irenas was well aware of D'Amario's criminal record, and allowed the Government to introduce evidence of that criminal history. The Court conducted a Rule 403 balancing test and determined that the evidence was essential to the jury's determination of whether the Memorandum was a true threat because the jury could not determine whether it would have been reasonable

11

for Judge Irenas to view the Memorandum as such unless it shared his knowledge of D'Amario.

The Court also concluded that under Rules 403 and 404 the evidence was essential to prove D'Amario's criminal intent. The Government was entitled to show that D'Amario sent the Memorandum because he understood that the language he employed, combined with Judge Irenas's knowledge of his record, would tend to intimidate the Judge.

The Court further concluded that the evidence was relevant to establish D'Amario's motive and that the probative value for that purpose outweighed the prejudicial impact. The Government sought to show that D'Amario sent the Memorandum because he strongly wanted to remain in prison and avoid serving a term of supervised release. The Court determined that the jury could make sense of this only if it understood D'Amario's criminal record.

We agree with the District Court that, for these reasons, the evidence of D'Amario's criminal history was relevant and had a proper evidentiary purpose other than to demonstrate character or propensity to commit crime. We further agree that the probative value of the evidence outweighed the potential for prejudice because the evidence was highly probative for determining two essential elements of the § 115 violation, whether the Memorandum was a "true threat" and whether D'Amario had the intent to intimidate Judge Irenas on account of the Judge's performance of official duties.

12

Finally, we note that, at the time of the admission of this evidence and in its final instructions, the Court repeatedly emphasized to the jury that it could consider this evidence for three purposes only. For example, the following admonition was conveyed at the close of the evidence:

> You have heard evidence of the defendant's prior criminal record. You have also heard evidence and received document[s] pertaining to that record. I instruct you that this evidence was introduced for three reasons. You may consider that evidence only for any or all of those reasons. [Discussion of the three reasons as listed above].
> . . . . . .
> I caution you, however, that you may not consider any evidence regarding any of the defendant's prior criminal conduct for any other purpose. In particular, you may not conclude, based on that evidence or otherwise, that the defendant is a bad person or that he was predisposed to commit the charged crime in this case.
> The defendant is not on trial for any acts or crimes not alleged in the indictment. Nor may the defendant be convicted of the crime charged even were you to find that he committed other crimes, even crimes similar to the one charged in the indictment.

SA387; *see also* SA228-29 (similar instruction given during trial).

We cannot conclude that the District Court abused its discretion in admitting the evidence of D'Amario's criminal history.

### C. Jury Instructions

D'Amario next urges that the District Court erred in its jury instructions by failing to instruct the jury as to specific intent, a necessary element under § 115. He complains specifically of the Court's failure to tell the jury that the Government was required to prove that he intended to carry out the threat against the judge. D'Amario failed to make

13

this objection at trial, and we therefore review it for plain error. *United States v. Williams*, 464 F.3d 443, 445 (3d Cir. 2006) (citation omitted). We conclude, however, that the District Court did not commit any error in instructing the jury on specific intent.

Consistent with the holding in *Kosma*, the District Court instructed that section 115 requires a showing that the defendant intentionally made a statement for the purpose of interfering with official duties which he anticipated would be interpreted by the recipient as a serious expression of an intention to do harm, that the statement was not the result of mistake or coercion, and that the Government need not prove that the defendant actually intended to carry out the threat:

> The key point is whether the defendant intentionally communicated the threat, not whether he intended or had the capability to carry it out. However, the fact that a defendant is incarcerated and cannot immediately carry out a threat is a factor you may consider.
>
> . . . . . .
>
> If the government proves beyond a reasonable doubt the existence of a threat by a defendant against the United States judge, you must then consider the remaining element of the offense, whether the defendant possessed the requisite specific intent.
>
> . . . . . .
>
> In order for you to find beyond a reasonable doubt the third element of the charged crime that the defendant acted with the requisite intent, you must unanimously agree about what the defendant intended to do. That is, you must all agree that the defendant intended to do one or more of the following things:
> One, to intimidate Judge Irenas while engaged in the performance of his official duties;
> Two, to obstruct Judge Irenas while engaged in the performance of his official duties;
> Three, to interfere with Judge Irenas while engaged in the performance of his official duties;
> Four, to retaliate against Judge Irenas on account of the performance

14

of his official duties.

SA389-90. D'Amario cannot show error, let alone plain error, in the District Court's instructions regarding specific intent.

### D. Alleged Prosecutorial Misconduct

During his closing argument, the prosecutor stated:

> Now, the defense may also ask why didn't the United States call Judge Irenas? The United States didn't call Judge Irenas. In our opening statement we said we weren't going to call Judge Irenas and we didn't because it's a reasonable person test.
>      Now, the jury instructions also tell you a couple relevant things to this point. Number one, there's only three elements, and the jury instructions at approximately Page 6 say that Judge Irenas need not be called. The jury instructions also tell you this. Now, while the defense has no burden to put on a defense, they don't have to do anything, the United States must prove its case, but the defense did put on a defense here. . . . Judge Irenas was equally available to both sides. The defense chose not to call Judge Irenas as well. . . . You can't speculate on what Judge Irenas would have testified to if he had been called. You have the evidence of the judge's reactions, apply the reasonable person test.

A28. This was a correct statement of the law. *See, e.g.*, *United States v. Bahna*, 68 F.3d 19, 22 (2d Cir. 1995) (citing decisions from other Circuits that when a witness equally available to both sides is not called by either, the court may instruct the jury that no unfavorable inference can be drawn against either side). Consistent with this statement of the prosecutor, the Court gave the following instruction to the jury without objection from D'Amario:

> If it is peculiarly within the power of either the government or the defense to produce a witness who could give relevant testimony on an issue in the case, failure to call that witness may give rise to an inference that this

15

testimony would have been unfavorable to that party. No such conclusion should be drawn by you, however, with regard to a witness who is equally available to both parties or where the testimony of that witness would merely be repetitive or cumulative.

SA387.

Contrary to D'Amario's argument, the prosecutor did not ask the jury to draw a negative inference against D'Amario because he did not call Judge Irenas as a witness, nor was the prosecutor suggesting that D'Amario had the burden to present Judge Irenas as a witness in his defense. As the District Court noted, "the Government properly informed the jury that the defense did not have a burden to put on a defense." *Id*. at 526. The Court also gave the following jury instruction on the issue: "You must always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence." *Id*. at 387. There was no prosecutorial misconduct involved in the above quoted portion of the Government's closing, and the jury could not have been misled with respect to its burden of proof.

## E. Other Alleged Errors

D'Amario next insists that Judge Diamond improperly and erroneously determined that the threat was "true," and then allowed the Government to support that finding for the jury and tailored his jury instructions according to the improper determination. According to D'Amario, Judge Diamond prejudicially impacted the trial by weighing the evidence, determining the credibility of witnesses, or substituting his version of the facts for the jury's version.

16

D'Amario has not provided an example of any instance in which Judge Diamond

determined that the threat was "true" and then tailored his jury instructions to reflect that

determination. Examining the relevant portion of the jury instructions, Judge Diamond

properly instructed the jury as to what constitutes a "true threat" and left that

determination to the jury:

> Whether a particular statement is a threat is governed by an objective standard. That is, you must consider whether the communication would cause a reasonable person in the recipient's circumstances to fear bodily harm or death. You may consider the recipient's state of mind, as well as the actions taken in response to the recipient's receipt of the threat in determining whether the statement constitutes a true threat.
>
> . . . . . .
>
> The right to free speech protects expressions and opinions that are offensive to some. The First Amendment protects scurrilous parodying of public figures and public officials. A federal judge is a public official. Every person has a right to communicate with public officials calling attention to improper conduct and the language used may [be] vehement, vituperative, or abusive without violating the law. A person has the right to publish scathing criticism of what happens within the courthouse.
>
> I instruct you that a true threat as I have defined that term in these instructions is not protected by [the] First Amendment to the United States Constitution. Thus, if you find that the government has proved beyond a reasonable doubt that the defendant knowingly and willfully communicated a statement to Judge Irenas that was a true threat, you may not acquit the defendant based on your understanding of the constitutional protections for speech.

SA389-91.

D'Amario also argues that the Court's decision to allow the Government to

stipulate to the testimony of one of his proffered witnesses was error. At trial, the Court

rejected D'Amario's request to call Dr. William R. Carter as a witness. D'Amario

17

proffered that Dr. Carter would testify that: (1) D'Amario often displayed a sarcastic attitude toward the federal judiciary; and (2) Dr. Carter had determined that D'Amario was suffering from no major mental illness. The Court conducted a hearing pursuant to Fed. R. Evid. 104, in which Dr. Carter participated by telephone, to determine the admissibility of the testimony. Dr. Carter recalled that D'Amario was generally sarcastic about the federal judiciary, and stated that he was part of the panel that concluded that D'Amario did not have any major mental illness. The Government stipulated to the testimony regarding mental illness, and the Court ruled that Dr. Carter's description of D'Amario's hearsay statements about the federal judiciary were neither relevant nor otherwise admissible.

D'Amario contends that allowing the Government to stipulate to Dr. Carter's testimony, rather than allowing Dr. Carter himself to testify, was improper and is further evidence that "Judge Diamond [] scripted the trial and left little doubt about the inevitable outcome for the Appellant." Appellant's Br. at 8. However, the District Court did not abuse its discretion in excluding hearsay evidence that was not relevant. Nor is it clear how a stipulation of the testimony was improper and scripted the trial to lead to an inevitable outcome of guilt. The testimony was testimony that D'Amario himself wanted to submit, presumably because he felt it was beneficial to him, and the fact that the Government stipulated to that evidence could therefore only further benefit D'Amario.

Finally, in his *Pro Se* Letter Brief, D'Amario supplemented his counsel's

18

arguments with the following ground for reversal:

> Judge Diamond jumped on a mistake Ralph Jacobs made at the outset of trial and ruled Jacobs "opened the door" for the prosecutor to read into the record Judge Irenas' comments at hearings of 2001-02. Jacobs objected to preserve the issue. Reading a judge's comments from a previous hearing to a criminal trial jury is reversible error and led to a new trial in the similar U.S. v. Blanchard, 542 F.3d 1133, 1151-52 (7th Cir. 2008).

Comments made at a previous judicial hearing may be admissible in a subsequent criminal jury trial if relevant, if not offered for the truth of the comments or if an exception to the hearsay rule applies, and if otherwise consistent with the Rules of Evidence. Even if not admissible, erroneous admission of such comments is reversible error only if they could conceivably have prejudiced the defendant. In *United States v. Blanchard*, 542 F.3d 1133, 1151-52 (7th Cir. 2008), the Court found reversible error because the introduction of the trial judge's earlier suppression hearing commentary in the same case, which reflected his conclusion that a defense witness was not credible, violated Rules 403 and 605 and was clearly prejudicial.

In this case, evidence from D'Amario's prior trial was admitted and relied upon by both sides for the purpose of showing the information Judge Irenas possessed when he read D'Amario's letter. It was relevant evidence and not hearsay when offered for this purpose. D'Amario has directed our attention to no evidence from the prior trial that we

19

can say was inadmissible or held the potential for unfair prejudice to him.[3]

IV.

The judgment of the District Court will be affirmed.

---

[3]D'Amario also argues that the District Court erred at trial in admitting his letters from prison to his former counsel, Ed Roy. Ltr. to Clerk of the Court, April, 24, 2009, Supp. *Pro Se* Br. He argues that although the letters were deemed admissible in a prior trial in 2001, they can still be challenged in this instant case as privileged, citing *In re Neff*, 206 F.2d 149 (3d Cir. 1953). The issue in *Neff* was whether a witness under subpoena during a criminal trial may be compelled over her objection based on the constitutional privilege against self-incrimination to answer certain questions which she had answered a year earlier before the grand jury which indicted the defendant on trial. This is distinct from the issue of whether attorney-client communications are privileged and whether that privilege has been waived. We can not comment on the District Court's determination on that issue because the issue has not been preserved for this Court. We do note that the attorney-client privilege is narrowly construed, protects only those disclosures necessary to obtain informed legal advice, and is waived once the client discloses the information to third parties unless the disclosure serves the purpose of enabling the client to obtain legal advice. *See Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423-24 (3d Cir. 1991).

20