**UNITED STATES of America,
Appellee,**

**v.**

**Ronald Douglas PATILLO, Appellant.**

**No. 13948.**

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1970.

Decided Aug. 20, 1970.

Victor J. Ashe, Norfolk, Va. [Court-appointed] (S. W. Tucker, Seymour Dubow, and Hill, Tucker & Marsh, Richmond, Va., on brief) for appellant.

Roger T. Williams, Asst. U. S. Atty. (Brien P. Gettings, U. S. Atty., on brief) for appellee.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Ronald Douglas Patillo was convicted on two counts of threatening the life of the President of the United States in violation of 18 U.S.C. Section 871[1] and was sentenced to terms totaling four years.[2] He appeals, and we reverse and remand for a new trial.

## I.

The district judge, without a jury, found that Patillo made unlawful threats against President Nixon on two occasions while on duty as a security guard at the Norfolk Naval Shipyard. On the night of May 16, 1969, Patillo and another guard, Herbert N. Cherry, with whom he was only casually acquainted, were riding in a patrol car. Without preamble or explanation, Patillo stated to Cherry: "I'm going to kill President Nixon, and I'm going to Washington to do it." Neither conversant made further reference that night to the subject of Patillo's statement. Cherry reported the incident to his supervisor who in turn informed the Secret Service.

On May 22, 1969, a Secret Service agent was secreted in the trunk of a patrol car to be operated by Patillo and Cherry. While on patrol, with the Secret Service agent listening, Cherry engaged Patillo in conversation about the current rioting and about the President's nomination of a new Chief Justice of the Su-

---

1. 18 U.S.C. Section 871. Threats against President and successors to the Presidency. (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of the President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Patillo was sentenced to two consecutive two year terms under the provisions of 18 U.S.C. Section 4208(a) (1964).

preme Court. Patillo said that the rioting was bad, but did not reply to Cherry's inquiries about the Supreme Court. Cherry then asked Patillo if he thought "Mr. Nixon was doing a good job." Patillo said, "I will take care of him personally." Cherry asked how Patillo intended to accomplish that. Patillo did not directly respond, but stated that "he would gladly give up his life doing it * * *." Patillo further declared, in response to another question from Cherry, that getting close to the President would present no problem because "he (Patillo) did not need to get close to him (the President) to do it * * *." At that point the conversation terminated.

The trial court fully credited Cherry's testimony and that of the Secret Service agent. Patillo testified that he had no recollection of the May 16 conversation. He contended that he had nothing against President Nixon, that he didn't vote, that he was not concerned about politics and that he did not make the statement attributed to him by Cherry. As to the May 22 incident, Patillo testified that he remembered a discussion about the riots but that he had not mentioned or referred to President Nixon.

## II.

▇▇▇ The Supreme Court recently interpreted, for the first time, the statute under which Patillo was convicted. Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In a per curiam opinion, the Court held that

18 U.S.C. Section 871(a) is constitutional on its face.

The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence. See H. R. Rep. No. 652, 64th Cong., 1st Session (1916). Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech. 394 U.S. at 707, 89 S.Ct. at 1401.[3]

In deciding Watts, the Court recognized two major elements in the offense created by Congress in 18 U.S.C. Section 871(a). The first is that there be proved "a true 'threat'", 394 U.S. at 708, 89 S.Ct. 1399 and the second is that the threat be made "knowingly and willfully", 18 U.S.C. Section 871(a).

▇▇ The proof in this case clearly meets the first requirement. Patillo's statements can be viewed only as true threats. He does not assert that his statements were political hyperbole or mere jest.[4] Compare, Watts v. United States, supra, and Alexander v. United States, 418 F.2d 1203 (D.C. Cir. 1969). Instead, his defense was a general denial. His testimony that he was not concerned with politics and that he never voted was offered to make plausible his

3. The Supreme Court's flat statement upholding the statute's facial constitutionality unquestionably forecloses these arguments urged upon us by the appellant: (1) The constitution forbids punishment of pure speech as treason or otherwise, and (2) The statute is unconstitutionally vague.

4. Cases decided by the lower federal courts prior to the Supreme Court's Watts decision had placed an extremely broad interpretation upon the "threat" requirement of 18 U.S.C. § 871(a). Neither conditional language, United States v. Jasick, 252 F. 931 (E.D.Mich.1918), nor jest, Pierce v. United States, 365

F.2d 292 (10th Cir. 1966), nor political hyperbole, Rothering v. United States, 384 F.2d 385 (10th Cir. 1967) escaped inclusion in the pre-Watts definition. Indeed, most of the early cases indicate a preoccupation with the supposed disloyal nature of the utterances punishable under the statute. E. g., United States v. Stobo, 251 F. 689 (D.Del.1918); United States v. Stickrath, 242 F. 151 (S.D. Ohio 1917). See, generally, Comment, Threatening the President: Protected Dissenter or Potential Assassin, 57 Geo. L.J. 553 (1969) and Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (Douglas, J., concurring).

assertion that he did not utter the words —not to mitigate or explain away their apparent meaning. Within the *Watts* requirement that the defendant's statement be examined in its full context, Alexander v. United States, 418 F.2d 1203 (D.C. Cir. 1969), it is clear that Patillo's flat statement without provocation, that he was "going to kill President Nixon * * *" was a true threat.

Unlike the May 16 threat, the statements of May 22 were uttered in a context of political discussion. However, it was a very brief discussion. Cherry's first mention of President Nixon triggered the bald statement: "I [Patillo] will take care of him personally." In view of Patillo's admitted lack of concern with politics and with regard to the full context of his statements, the inference drawn by the district judge that the May 22 statement was also a true threat cannot be held erroneous.[5]

### III.

We agree with the district judge that the statements made by Patillo were true threats. We must next determine whether the trier of fact properly found that those threats were uttered with the degree of willfulness sufficient for conviction under Section 871(a).

Although recognizing the "willfulness" requirement of Section 871(a), the *Watts* decision does not resolve a long term controversy over whether "willfulness" means "that a defendant must

have intended to carry out his 'threat'." 394 U.S. at 707, 89 S.Ct. at 1401. "Some early cases," the Court observed, "found the willfulness requirement met if the speaker voluntarily uttered the charged words with an apparent determination to carry them into execution. Ragansky v. United States, 253 F. 643, 645 (CA 7th Cir. 1918) (emphasis supplied); cf. Pierce v. United States, 365 F.2d 292 (CA 10th Cir. 1966). * * * Perhaps [the Ragansky] interpretation is correct, although we have grave doubts about it. See the dissenting opinion below, [Watts v. United States] 131 U.S. App.D.C. 125, 402 F.2d 676, at 686–693 (Wright, J.)" Watts v. United States, 394 U. S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).[6]

Whatever the motivation for the enactment of Section 871(a), see Watts v. United States, 394 U.S. 705, 709, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (Douglas, J., concurring), it is valid as a safety measure to protect the President and to allow him to perform his duties without interference from threats of physical violence. Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); Watts v. United States, 131 U.S.App.D.C. 125, 402 F.2d 676, 679 (1968) (Wright, J., dissenting); both citing H.R.Rep. No. 652, 64th Cong., 1st Session (1916). The statute must be strictly construed, as are all criminal statutes, to accomplish no more than this purpose. Chief Justice Marshall best stated this rule of

---

5. The appellant contends that his statements on May 16 and those on May 22 should not be considered together for purposes of establishing their nature or the intent with which they were made. We reject this contention. It is familiar learning that similar offenses, close in time, may be viewed together to establish intent and knowledge. McCormick, Evidence Section 157. Furthermore, one statement constituting a threat to the President may be, as here, part of "the full context" in which was made another statement also alleged to con-

stitute an unlawful threat. Such statements, though made at different times, must perforce be considered together. *See* Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); Alexander v. United States, 418 F.2d 1203 (D.C.Cir. 1969).

6. For early interpretations of the willfulness requirement *contra* the Ragansky rule, see United States v. Metzdorf, 252 F. 933 (D.Mont.1918), and United States v. French, 243 F. 785 (S.D.Fla.1917).

construction in United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37 (1820):

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself * * * The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest.

5 Wheat. at 95–96, 5 L.Ed. 37, quoted in Yates v. United States, 354 U.S. 298, 304, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). We think that many of the courts that construed Section 871(a) prior to Watts departed "from the plain meaning of words * * * in search of an intention which the words themselves did not suggest," with pernicious results. For example, one court held that "[t]he vital inquiry under the act is whether the threat is of such a nature as to create or tend to create sedition or disloyalty." United States v. Stobo, 251 F. 689 (D.Del.1918). In United States v. Stickrath, 242 F.151 (S.D.Ohio 1917), the first case construing Section 871(a), the court held that the words "knowingly and willfully" in the statute "are intended to signify that the defendant, at the time of making the threat charged him, must have known what he was doing, and, with such knowledge, proceeded in violation of law to make it. They are used in contradistinction to 'ignorantly' and 'unintentionally'." Id. at 154. The interpretation of "knowingly and willfully" alluded to by the Supreme Court in Watts was first stated in Ragansky v. United States, 253 F. 643, 645 (7th Cir. 1918):

> A threat is knowingly made, if the maker of it comprehends the meaning of the words uttered by him. * * * And a threat is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and intentionally utters them as the declaration of an apparent determination to carry them into execution.

This language in Ragansky was part and parcel of a holding, now discredited by Watts, that a statement made in jest falls within the ambit of Section 871(a).

■ The Ragansky interpretation of "willfully and knowingly" is not in keeping with the meaning traditionally accorded to those words when found in criminal statutes. "The word [willfully] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose. * * *" United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). Ragansky's version of the willfulness requirement demands only an "apparent determination," expressed by the words themselves, to perpetrate the act threatened. We believe that a "bad purpose" assumes even more than its usual importance in a criminal prosecution based upon the bare utterance of words. Americans, nurtured upon the concept of free speech, are not accustomed to controlling their tongues to avoid criminal indictment.

■ This case does not involve the communication, or attempted communication, by a defendant of his threat to the President. Accordingly, we do not here consider what intent requirement may be effective to accomplish an insulation of the President from threats of violence to his person and also be in accordance with the wording of Section 871(a). We hold that where, as in Patillo's case, a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present in-

tention to do injury to the President.[7] Such intent may take the form of a bad purpose to personally do harm to the President or to incite some other person to do the injury. This is the most reasonable construction of the statute's plain language viewed in light of Congress' manifest purpose to protect "the safety of [the] Chief Executive." 394 U.S. at 707, 89 S.Ct. 1399. There is no danger to the President's safety from one who utters a threat and has no intent to actually do what he threatens. While threatening remarks made without intent to later carry them out and without intent to incite others may, nevertheless, incite others, Congress has precluded the application of the statute to such remarks by requiring willfulness by him who threatens. Without so deciding, we note that an exception, under the normal definition of willfulness, may occur where inflammatory statements are made in a "full context" evidencing on the part of the speaker a reckless disregard for the strong likelihood that his listeners would be incited to do harm to the President.

■ The district court, quite understandably, applied the time honored *Ragansky* willfulness requirement, which we today reject, to Patillo's case. The court articulated that rule as follows:

> The question of intent really is not the issue or a bad purpose is not nec-

essary to constitute a violation of the law when the threat is made, and when the section refers to "knowingly and willfully" it means that it is knowingly made if the maker comprehends the meaning of the words which are uttered by him and is willfully made if, in addition to comprehending the meaning of the words, the maker voluntarily and intentionally utters them as a declaration of an apparent determination to carry them into execution.

Because Patillo was thus tried in accordance with legal principles that we have found to be erroneous, his convictions under 18 U.S.C. Section 871 must be reversed and his case remanded for a new trial.

Reversed and remanded.

ALBERT V. BRYAN, Circuit Judge (dissenting):

I would affirm on the construction of the statute, 18 U.S.C. § 871(a), as stated in Watts v. United States, 402 F.2d 676, 678–682 (D.C.Cir.1968) by Circuit Judge Burger, now the Chief Justice of the United States: "it is the *threat* which must be 'knowingly and willfully' made and not * * * the intent to execute the content of the threat * * *. at 680."

---

7. As noted by Wright, J., dissenting in Watts v. United States, 402 F.2d 676, 687 (D.C.Cir. 1968), this was the view stated by a Congressman who sponsored the bill codified as 18 U.S.C. § 871. Referring to the intent requirement, Congressman Webb said: " * * * I think he ought to be shown to have done it willfully. I think it must be a willful intent to do serious injury to the President. If you make it a mere technical offense, you do not give him much of a chance when he comes to answer before a court and jury. I do not think we ought to be too anxious to convict a man who does a thing thoughtlessly. I think it ought to be a willful expression of an intent to carry out a threat against the Executive, and I hope that the gentleman will not offer his amendment [to delete the willfulness requirement]." 53 Cong. Rec. 9378 (1916).