**UNITED STATES of America,**

v.

**Donald Lee FENTON, Defendant.**

No. 98–1J.

United States District Court,
W.D. Pennsylvania.

Dec. 22, 1998.

Marketa Sims, Federal Public Defender's Office, Pittsburgh, PA, for Donald Lee Fenton, defendant.

Leon Rodriguez, United States Attorney's Office, Pittsburgh, PA, John J. Valkovci, Jr., United States Attorney's Office, Johnstown, PA, for U.S.

## MEMORANDUM OPINION and ORDER

D. BROOKS SMITH, District Judge.

Donald Lee Fenton was tried before a jury and found guilty of violating 18 U.S.C. § 115(a)(1)(B), threatening a federal official. At the close of the government's case, as well as at the conclusion of all the evidence, Fenton moved for a judgment of acquittal under Fed.R.Crim.P. 29, arguing that the evidence was insufficient to support his conviction. I deferred ruling on both motions. After careful consideration of the briefs and oral argument, I agree and will grant the motion.[1]

---

1. Fenton has also been prosecuted under state law for terroristic threats and harassment by communication. It goes without saying that his conviction in the Court of Common Pleas of Cambria County is unaffected by the instant adjudication.

## I.

Fenton's conviction arises out of a heated conversation with insurance adjuster Randy Leventry, in which he made death threats against, *inter alia,* Leventry, the staff of the Johnstown, Pennsylvania office of Erie Insurance Company, United States Representative John Murtha and his aide, John Hugya. The evidence at trial revealed that this altercation arose, not over matters of political philosophy, but over a dispute concerning allegedly defective repairs to Fenton's fourteen-year-old pickup truck. How Congressman Murtha's name came to be involved in this otherwise private dispute bears further discussion.

Fenton, an odd jobs contractor by trade and a community activist by self-profession, developed a somewhat grandiose plan by which he believed he could rejuvenate Johnstown's flagging local economy. This plan, according to Fenton, required some $60 million in federal funding. To secure that money, he contacted the offices of Congressman Murtha and was directed to Murtha's local aide, John Hugya. Hugya agreed to meet Fenton and discuss his plan sometime in July 1996 at a restaurant at the top of the Johnstown Inclined Plane. Fenton arrived at the meeting with his plan, contained in a pizza box, which involved various flood control, transportation and recreational "improvements." Hugya told Fenton that a plan of such size would normally require a partnership of federal, state and local governments and directed him to John Skiavo at Johnstown Area Regional Industries. Dkt. no. 127, at 66. The meeting then ended, and the two had no further contact.

Fenton, however, believed that Hugya and Murtha liked his "plan" and wanted to take credit for it themselves, even if that meant ruining him, discrediting him or driving him to suicide in the process. He therefore came to see both Murtha and Hugya as conspirators against him, although there existed no rational basis for such a conclusion.

Almost a year later, in June 1997, Fenton brought his pickup truck to Carmen's Wholesale Tires to get an oil change. The mechanic, however, failed to replace the oil, as a result of which the truck's engine was de-stroyed. Carmen's was insured by Erie Insurance Company, which assigned Randy Leventry to investigate the claim on June 5. Leventry authorized the installation of a rebuilt engine.

After Fenton's truck was returned on June 13, it was discovered that the mechanic who installed the engine had not replaced the pilot bearing, which resulted in the destruction of the transmission. Leventry authorized the transmission to be replaced as well. Fenton's truck was serviced by John's Transmissions and returned to him on July 2. The very next day, the truck developed further problems involving oil leakage, which were repaired by Laurel Ford but which kept Fenton's vehicle out of operating condition until July 17. Erie Insurance did not pay for these repairs, as they were covered under the engine warranty. The same problem recurred on November 24, and Leventry instructed Fenton to bring his truck back to Laurel Ford. The malfunction was corrected and the truck was returned.

Unfortunately, the engine problem occurred again on December 3, and it proved to be too much for Fenton to take. He called Leventry and "said that the truck was leaking oil and spewing oil everywhere, that he was—he wanted something done. He's tired of all this, these problems with the truck. He said that he had gotten a gun and bullets and he was going to start killing people." Dkt. no. 126, at 64 (Leventry, direct). Fenton went on to tell Leventry that if Laurel Ford "said they repaired the truck, they're liars[ ]" and that the truck was worse than it was before the repairs were performed. *Id.* Fenton continued to discuss his claim with Leventry, who testified that his demeanor was, for the most part, "fairly matter of fact[ ]" in this portion of the conversation. *Id.* at 65.

As the discussion progressed, however, Fenton's tone became more agitated and he seemed desperate. *Id.* "[H]e said that Murtha, Congressman Murtha, was conspiring with the insurance company and the *[Johnstown] Tribune–Democrat* to ruin him and to cause him to commit suicide." *Id.* Fenton then stated "that he was going to shoot Congressman Murtha's head off. He also said

that he was going to shoot John Hugya's head off." *Id.* at 66. Later in the conversation, Fenton told Leventry "that he was going to kill all Erie [Insurance] employees." *Id.* at 67. He continued, "I may not kill you, but if I were you, I would keep my doors locked because once this gets started, I don't know what's going to happen." *Id.* Fenton then elaborated further about the nature of the "conspiracy" he believed was operating against him:

He did say that Murtha stole his ideas for an economic recovery plan that he had drawn up. It had to do with an overhead rail transportation system and other ideas that he had.... He said that since Mr. Murtha stole Mr. Fenton's ideas, that now Mr. Murtha would have to see that Fenton's either killed or commit [sic] suicide.

*Id.* at 67. Fenton went on:

He said he had spoken to his pastor, and he had—he knows that God would forgive him for what he's going to do; that if the Government declares war on him, he was going to have to take a body count.... He said he was desperate, that he hadn't eaten for three days; that Congressman Murtha's trying to destroy his business and has succeeded in doing so.... Mr. Fenton told me that he had been to Vietnam, he said, in 1975. He said that he had seen people die there, that he's not afraid to die. He said that he would kill until he's killed. He said that when he dies, there would be a tape, that he had produced a videotape. It would be disseminated to the press, it would be detrimental to Mr. Murtha. It would lay out the entire conspiracy....

Towards the end of the conversation I told Mr. Fenton that I hoped that this was his way of reaching out for help. He told me to tell that to CNN. I told him that I would not—I would not be able to keep this silent, that I would have to make a few calls. He understood that.

*Id.* at 68, 70.

Fenton did not tell Leventry to convey the message to Murtha, nor was there evidence

to suggest that Fenton even implied that Leventry should do so. For his part, Leventry did not tell Fenton that he was going to relay the contents of the conversation to Congressman Murtha, nor did he contact the Congressman's office. *See* dkt. no. 127, at 42 (Leventry, cross). In response to Fenton's agitated statements, Leventry called the local police department, resulting in Fenton's arrest. Officer Price subsequently contacted Hugya and apprised him of Fenton's statements. *See* dkt. no. 127, at 58. Hugya then called FBI Agent Dale Frye. *Id.* at 69.

Fenton was subsequently indicted under 18 U.S.C. § 115(a)(1)(B) for threatening Murtha (Count I) and Hugya (Count II). On Fenton's motion, I dismissed Count II, holding as a matter of law that Hugya was not an "official" within the group of protected persons enumerated in § 115. *United States v. Fenton*, 10 F.Supp.2d 501 (W.D.Pa.1998).[2] The case was tried to a jury in July 1998, which returned a verdict of "guilty" at Count I, threatening Congressman Murtha.

## II.

Fenton contends, under Fed. R.Crim.P. 29, that the evidence introduced by the government at his trial was insufficient to support his conviction under 18 U.S.C. § 115(a)(1)(B). In deciding the question of sufficiency, the evidence must be viewed in the light most favorable to the government, and the conviction must stand unless it appears that there was no substantial evidence from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Cooper*, 121 F.3d 130, 133 (3d Cir.1997); *United States v. Obialo*, 23 F.3d 69, 71–72 (3d Cir.1994).

The statutory provision under which Fenton was indicted provides, in pertinent part:

Whoever ... threatens to assault, kidnap, or murder, a United States official ... [i]

2. I also granted in part Fenton's motion to suppress certain evidence, *United States v. Fenton*, Crim. No. 98–1J, 1998 WL 356889 (W.D.Pa. May 28, 1998), and denied his motion to dismiss the indictment on account of alleged prosecutorial

misconduct before the grand jury, *United States v. Fenton*, Crim. No. 98–1J, 1998 WL 356891 (W.D.Pa. June 29, 1998). Familiarity with those opinions is helpful, but not necessary, to an understanding of this memorandum.

with intent to impede, intimidate, or interfere with such official ... while engaged in the performance of official duties, or [ii] with intent to retaliate against such official ... on account of the performance of official duties, shall be punished as provided in subsection (b).

18 U.S.C. § 115(a)(1). This language contains an *actus reus,* specifically, making a threat, as well as two defined forms of *mens rea:* (1) intent to prospectively interfere with the victim's exercise of official duties; or (2) intent to retaliate against the victim for the past exercise of official duties. I will discuss these elements *seriatim.*

### III.

 Section 115(a)(1)(B) proscribes only threatening communications, recognizing that not all apparently threatening utterances fall into the category of "true threats." The words spoken by Fenton without question reeked of animus, but his statements regarding Congressman Murtha were made only to Leventry. The evidence shows merely that Leventry was an insurance adjuster with no connection to Murtha. The question that animates this case, then, is whether such remarks, spoken during a conversation with an unrelated third party and not directly to the victim, constitute a threat within the meaning of the statute. I conclude that, on these facts, they do not.

The statute criminalizes a form, albeit an unsavory one, of pure speech. As such, "it must be interpreted with the commands of the First Amendment clearly in mind," *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and

public officials." *Id.* at 708, 89 S.Ct. 1399 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Moreover, Anglo–American jurisprudence in recent centuries has rejected the notion that a person's mere thoughts, however evil, can be criminalized. *See id.* at 709–711 & nn. 1, 2 (Douglas, J., concurring) (discussing English law of constructive treason and the American Alien and Sedition Acts); *United States v. Alkhabaz,* 104 F.3d 1492, 1494 (6th Cir.1997) ("our law does not punish bad purpose standing alone").

Thus, in *Watts,* the Supreme Court reversed the defendant's conviction under 18 U.S.C. § 871 for threatening the life of President Johnson under circumstances clearly indicating that his remarks were nothing more than "a kind of very crude offensive method of stating a political opposition to the President."[3] 394 U.S. at 708, 89 S.Ct. 1399. On the other hand, true threats enjoy no legal protection. *See United States v. Kosma,* 951 F.2d 549, 553 (3d Cir.1991).

At the polar opposites, this distinction is easily applied. Had Fenton accosted Congressman Murtha in person or written him a letter, there would be no question, based on the words he used, that a true threat was intended. The remarks need only be such that "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm or take the life of the [object]." *Id.* at 557 (citing cases) (threatening communication mailed to President Reagan); *accord United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 (9th Cir.1990). It seems equally clear that, had Fenton hiked alone several miles into a forest and recited his diatribe only to himself, convicting him under § 115 would be tantamount to punishing his mere thoughts rather than any actual threat. So too, had he uttered the words to

---

**3.** In *Watts,* defendant was a young man who attended a protest rally in Washington. Speaking up in an open-air discussion group, he stated, "And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want in my sights is L.B.J. They are not going to

make me kill my black brothers." 394 U.S. at 706, 89 S.Ct. 1399. The other participants, as well as the speaker himself, responded to this statement with laughter. *Id.* at 707, 89 S.Ct. 1399. In addition, the Court noted that defendant's "threat" was conditional, and based upon an event he vowed would never occur. *Id.*

a close friend or relative in strict confidence, conviction under this statute would be unjustified. But here, Fenton's words were spoken to a third party unrelated to their object, and whose relationship with Fenton was at least arguably adversarial, placing this case somewhere between these two extremes.

Two courts have recently dealt with this issue. In *United States v. Bellrichard,* 779 F.Supp. 454 (D.Minn.1991), *aff'd,* 994 F.2d 1318 (8th Cir.1993), defendant sent a series of threatening letters, most of them directly to their intended victims,[4] and was indicted under 18 U.S.C. § 876 for mailing threatening communications. One letter, however, was mailed to the girlfriend of a defendant awaiting sentencing. In that letter, defendant threatened to kill the sentencing judge. *Id.* at 457–58. In holding that such a communication did not constitute a true threat because there was no connection between the recipient and the intended victim, the court opined:

> In the present case, the postcard to Ms. Hoeper contains no request that it be communicated to the individuals allegedly threatened. There was no evidence at trial that Ms. Hoeper was likely to understand that the postcard was to be so communicated or that it was likely that it would be. Indeed, there was no evidence that Ms. Hoeper had any connection with

the persons allegedly threatened which could make the language used by the defendant in his postcard to her a true threat against those persons. The specific language of the postcard should not be isolated from the whole context of the communication. No reasonable recipient, in light of the context, could interpret the defendant's statements about third parties as a true threat within the ambit of *Watts.* The statute should not be applied under these circumstances, and this count should not have been submitted to the jury.

*Id.* at 459.[5]

In *Alkhabaz,* the defendant was charged under 18 U.S.C. § 875(c) for sending messages over the Internet "which expressed a sexual interest in violence against women and girls." 104 F.3d at 1493. The messages contained stories, the content of which can only be described as horrific,[6] depicting in graphic detail "the abduction, rape, torture, mutilation, and murder of women and young girls." *Id.* One of these accounts named an actual young woman, resulting in defendant's prosecution under § 875(c) for interstate communications containing threats to injure another person. *Id.* The court considered whether these messages, which were not sent directly to the woman who was the purported victim, constituted true threats. It concluded they did not:

> the conduct of a member of the general public, who, attending this trial of widespread interest, took notes of defendant's statements and mailed them to a family member, law professor, or newspaper for their information. Of course these results are absurd and reach constitutionally protected speech. More must be required for conviction under the statute. Conviction requires that the communication be a true threat. This means that a reasonable recipient, familiar with the context of the communication, would interpret it as a threat. It is this contextuality which prevents conviction under the hypothetical situations described.

> *Id.* at 459 (footnotes, citations and internal quotation marks omitted).

---

4. The court upheld those convictions. *Id.* at 461.

5. The *Bellrichard* court went on to state:
 The interpretation of the statute favored by the government could lead to absurd results since it does not take into account the particular context of third party threats. The First Amendment limits the reach of the statute as to third party threats by requiring consideration of the whole context of the communication. The statute should not be interpreted to cover every letter which, apart from its context, seems to threaten a person other than the addressee or letter recipient, as the government argues. For example, if a prosecutor mailed defendant's letters to another government official for analysis or review, that conduct could be covered by the statute—mailing a threat to injure the person of another. Similarly, if the court mails this opinion to West Publishing Company, having quoted verbatim the language used by defendant which is alleged to be threatening, that conduct could be covered by the statute. Also covered would be

6. *See id.* at 1497–98 n. 1 (Krupansky, J., dissenting) (setting forth one such message essentially verbatim). Because of the appalling content of this message and its publication elsewhere, I will not go into further detail here.

To determine what type of action Congress intended to prohibit, it is necessary to consider the nature of a threat. At their core, threats are tools that are employed when one wishes to have some effect, or achieve some goal, through intimidation. This is true regardless of whether the goal is highly reprehensible or seemingly innocuous.

For example, the goal may be extortionate or coercive.... Additionally, the goal, although not rising to the level of extortion, may be the furtherance of a political objective.... Finally, a threat may be communicated for a seemingly innocuous purpose. For example, one may communicate a bomb threat, even if the bomb does not exist, for the sole purpose of creating a prank. However, such a communication would still constitute a threat because the threatening party is attempting to create levity (at least in his or her own mind) through the use of intimidation.... Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation.... If an otherwise threatening communication is not, from an objective standpoint, transmitted for the purpose of intimidation, then it is unlikely that the recipient will be intimidated or that the recipient's peace of mind will be disturbed.

Even if a reasonable person would take the communications between [defendant] and [the recipient] as serious expressions of an intention to inflict bodily harm, no reasonable person would perceive such communications as being conveyed to effect some change or achieve some goal through intimidation. Quite the opposite, [they] apparently sent e-mail messages to each other in an attempt to foster a friendship based on shared sexual fantasies.

*Id.* at 1495–96.

Under either standard, Fenton's statements did not constitute threats. As in *Bellrichard*, there was simply no connection between Leventry, the recipient of the communication, and Murtha, its intended object. Moreover, under the circumstances presented here, no jury could find anything truly "threatening" in Fenton's remarks because they could not influence Murtha's attitude or behavior in any way when spoken only to Leventry.

The government cites a number of cases in which threats were not made directly to the speakers' intended victims, yet convictions were upheld. Careful review, however, reveals those cases to be inapposite. In *United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997), defendant threatened an FBI agent by leaving him a voicemail message, which the agent heard and "found chilling and scary." *Id.* at 1490. Other cases are in the same vein. In *Orozco–Santillan*, defendant threatened an Immigration and Naturalization Service officer over the telephone; once again, the agent heard the threat and was frightened. 903 F.2d at 1264. Likewise, in *United States v. Stevenson*, 126 F.3d 662 (5th Cir.1997), defendant wrote a threatening letter to his probation officer, which "frightened and alarmed" her when she received it. *Id.* at 663. And in *Kosma*, defendant wrote a series of threatening letters to President Reagan. 951 F.2d at 550. These letters, while never seen by the President, no doubt caused considerable consternation to the officers responsible for his protection. 951 F.2d at 554. As the court noted, moreover, they were directed "at the exact person whom Section 871 was designed to protect." *Id.* at 555.

The government relies principally, however, on *United States v. Snelenberger*, 24 F.3d 799 (6th Cir.1994), for the proposition that there need be no intent that defendant's statements be communicated to their target. There, the defendant told two mental health workers of his plans to kill an administrative law judge and was prosecuted under § 115. *Id.* at 801. On appeal, his conviction was affirmed. *Id.* at 803–04. In that case, however, defendant argued only that his *mens rea* was insufficient to support conviction, and the court never passed on the issue of whether the *actus reus* was proven. *See id.* at 803. Thus, while this case is relevant to an analysis of Fenton's intent, it has no

precedential value on whether he made a true threat.[7]

Accordingly, I conclude that Fenton's statements did not constitute true threats under § 115(a)(1)(B). For this reason alone, his motion for judgment of acquittal must be granted. In the interest of completeness, however, I will also address Fenton's argument that he did not, as a matter of law, possess the requisite intent to support his conviction.

## IV.

Assuming *arguendo* that the evidence did support a finding that Fenton made a true threat to Murtha, it still must be determined whether he had the intent that § 115(a)(1)(B) requires:

> [i] with intent to impede, intimidate, or interfere with such official ... while engaged in the performance of official duties, or [ii] with intent to retaliate against such official ... on account of the performance of official duties

I will address these two alternate forms of intent in turn.

## A.

■ For the reasons set forth *supra* in my discussion of *actus reus* and the *Alkhabaz* case, it cannot seriously be concluded that Fenton had any intent to impede, intimidate

or interfere with Congressman Murtha. Murtha was not "in the audience" when Fenton spoke, and the government put on no evidence that Fenton[8] intended his words to be conveyed to Murtha. One simply cannot be intimidated by speech of which he is unaware. *See Snelenberger*, 24 F.3d at 803 (noting that district court made similar holding under § 115(a)(1)(B) and concluding, in dictum, "that the court's reading of the statute was entirely justified"). *Cf. Patillo*, 431 F.2d at 298 ("There is no danger to the President's safety from one who utters a threat and has no intent to actually do what he threatens.")

In addition, there is no evidence that Fenton wanted Congressman Murtha to take any official action, or refrain from taking any such action, as a result of his "threats." Fenton was not, for example, demanding that Murtha sponsor a certain piece of legislation, nor did he make his threats to disrupt, say, an official speech to a group of constituents. It is perhaps arguable that he wanted the Congressman to support his plan, yet the record shows that Fenton thought that Murtha stole the plan from Fenton so he could bring it to fruition and take the credit for himself. Even under Fenton's distorted view of reality, there was no "official" action Murtha could take or not take that would satisfy Fenton's desires. At most, Congressman Murtha could have given Fenton the credit

---

**7.** Likewise, in *United States v. Patillo*, 431 F.2d 293 (4th Cir.1970), defendant stated to a co-worker his intention to kill President Nixon. *Id.* at 294–95. The court held that this statement amounted to a true threat, *id.* at 295, but significantly, defendant's defense was limited to a general denial of making the remark. *Id.* at 295–96. Thus, again, the court was never called on to decide the circumstances under which statements made to unrelated third parties constitute threats. Indeed, the government does not cite this case in its *actus reus* argument, but saves it for its discussion of Fenton's mental state.

**8.** The government essentially contends that the jury was entitled to find objective intent to communicate, arguing that "the most natural consequence" of making a series of death threats over the phone will be that the recipient of the communication will notify law enforcement, who in turn will notify the intended target. Dkt. no. 131, at 24. I disagree; although whether a statement constitutes a threat is evaluated under an objective standard, the standard for determining

specific intent under § 115(a)(1)(B) is subjective, as even the government argues elsewhere in its brief, dkt. no. 131, at 21. *See Fulmer*, 108 F.3d at 1494 (approving jury instruction to the effect that "[w]hen we are talking about the defendant's intent, we are talking about what he meant to do and what was in his mind[ ]"). Alternatively, the government may be seen as arguing that a jury could simply infer that Fenton intended for Leventry to warn Congressman Murtha as the "natural and probable consequence" of conveying the threat to Leventry. Again, I disagree. Leventry was not a law enforcement officer or member of the Congressman's staff. To assume that a private citizen will "naturally and probably" inform the target of the threat anytime a threat is made to a third party would effectively eviscerate § 115(a)(1)(B)'s intent requirement. All that can be inferred from this record is that Fenton intended to threaten *Leventry*, either to induce him to better handle his insurance claim or to retaliate for the way Leventry had already processed it.

Fenton thought he deserved, but that is not an official duty. Accordingly, even if Fenton had intended to impede, intimidate or interfere with Murtha, that intent had absolutely no nexus with any of the Congressman's official duties.

The government argues that there is no nexus requirement; rather, it contends that the defendant need only intend to impede, intimidate or interfere with the Congressman "during the time that" he is performing official duties. That is simply not what the statute provides. Section 115(a)(1)(B) is quite clear that the defendant's intent must be "to impede, intimidate or interfere with such official ... *while engaged in* the performance of official duties...." (Emphasis added.) *See United States v. Streich*, 759 F.2d 579, 584 (7th Cir.1985) (Whether an official is engaged in performance of official duties "turns on whether the federal officer is acting within the scope of what he is employed to do or is engaging in a personal frolic of his own."). Evidently, the government believes this condition is satisfied during the entire time that Congress is in session, or perhaps as long as the member holds office. This is implausible, leading as it does to absurd possibilities, for example, that a person could be convicted under § 115(a)(1)(B) for threatening a Member of Congress in response to an insult the Member made to that person's spouse during cocktail party conversation. Significantly, the government cites no useful authority for this novel proposition. The closest it comes is the case of *United States v. Berki*, 936 F.2d 529 (11th Cir.1991), but that case is inapposite. There, the defendant clearly threatened a federal judge on account of her performance of official judicial duties. *Id.* at 531. His defense was simply that he did not know that the object of his threat was a federal judge when he threatened her, a position which the Eleventh Circuit rejected

under a plain error standard of review. *Id* at 532. Accordingly, I reject the government's argument.

### B.

That leaves the government's contention that Fenton intended to retaliate against Congressman Murtha. This too is problematic, and the question turns on how "retaliation" is defined. Fenton asserts that there can be no threat with intent to retaliate unless the threatening words are communicated to their intended target. Dkt. no. 130, at 50. The government, for its part, essentially argues that communication of the threat to the victim is unnecessary if the defendant has the present intention of carrying out the threat at the time it is made. Dkt. no. 131, at 18.

It seems clear that, aside from the unfortunate circumstance in which the threat is actually carried out, no intent to retaliate can exist unless there are facts to support either the government's or Fenton's theory. A threat that is never communicated to the victim and is not intended to be carried out by its speaker is no retaliation at all. Indeed, it is no more than reciting lines of a play, in a closed room, to oneself. For the reasons already discussed, of course, there is no evidence that Fenton intended that his threats be communicated to Murtha. That squarely raises the question of whether a present intention to carry out a threat suffices to make out the intent to retaliate under § 115(a)(1)(B).

The government relies on *Snelenberger*, in which the court, with scant analysis and without reference to whether there was a present intent to carry out the threat, opined that there was no need for the threat to be communicated to the victim in order to have an intent to retaliate.[9] *Snelenberger* is unhelp-

9. The analysis the court did provide is somewhat cryptic:

The [district] court analyzed the statutory language in response to Snelenberger's request. The court held that the first part of § 115(a)(1)(B), which states that it is a crime for someone to threaten a judge "with intent to impede, intimidate, or interfere with such ... judge ... while engaged in the performance of official duties", requires that the threat-maker

intend that the threat be communicated to the judge because the threat-maker wanted to influence the judge's action. The court held that the second part of the statute merely states that the threat be made with the intent to retaliate against the judge after the judge had acted. The court held that it was not required that the threat-maker intend that the threat should be communicated to the judge. Since Snelenberger's action fell within the second part of the

ful, however, because of the limited argument that the defendant made in that case. Defendant had communicated his threat to kill an administrative law judge in the context of a conversation he was having with a psychotherapist, *id.* at 801, and contended that § 115(a)(1)(B) would be constitutionally overbroad absent an intent that the therapist communicate the threat, *id.* at 803. "His theory [was] that discussion between a therapist and patient is akin to writing personal thoughts in a diary." *Id.* The court rejected that argument, however, holding first that the issue was waived in the district court,[10] *id.* at 803, and second, that because he had uttered the same threat to an orderly who was transporting him, *see id.* at 801, his " 'diary' analogy [was] inappropriate." *Id.* at 803. *Snelenberger'*s pronouncement, then, is nothing more than unclear dictum which provides no doctrinal roadmap on intent to retaliate.

The more substantial of the government's arguments is that, under *Patillo,* a present intent to carry out the' threat is sufficient. In *Patillo,* two security guards at a naval shipyard were riding together in a patrol car when one of them told the other that he intended to kill President Nixon. 431 F.2d at 294. After repeating the threat under Secret Service surveillance, he was charged under 18 U.S.C. § 871.[11] *Id.* In reversing defendant's conviction and remanding for a new trial, the court opined:

> We hold that where, as in Patillo's case, a true threat against the person of the President is uttered without communication to the President intended, the threat can

form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President. Such intent may take the form of a bad purpose to personally do harm to the President or to incite some other person to do the injury. This is the most reasonable construction of the statute's plain language viewed in light of Congress' manifest purpose to protect the safety of the Chief Executive. There is no danger to the President's safety from one who utters a threat and has no intent to actually do what he threatens.

*Id.* at 297–98 (footnote, citation and internal quotation marks omitted).

*Patillo* is not persuasive in this context. First of all, that court was interpreting the willfulness requirement of § 871 and applied a subjective standard, specifically a present intention test. In *Kosma,* however, the Third Circuit rejected a subjective standard under § 871 in favor of an objective test, stating that "section 871 was intended to criminalize the mere utterance of a true threat, rather than the defendant's intention to carry out the threat." [12] 951 F.2d at 549. Accordingly, *Patillo* is not good authority in this circuit.

Moreover, § 871 requires only willful conduct to establish *mens rea,* while § 115(a)(1)(B) requires the specific intent to retaliate. Congress deliberately set a lower threshold for § 871 prosecutions, owing to the unique position of the President. *See Kosma,* 951 F.2d at 557. Under § 115(a)(1)(B), Congress did not, preferring to specify in detail the types of intent it

---

statute, there was no need for an instruction such as he requested. We hold that the court's reading of the statute was entirely justified. 24 F.3d at 803.

**10.** The court did not consider whether, notwithstanding defendant's waiver, there was plain error in the district court's ruling.

**11.** At the time *Patillo* was decided, the statute read:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice

President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of the President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

431 F.2d at 294. For present purposes, the language of § 871 has remained essentially unchanged.

**12.** The *Kosma* court did not cite or discuss *Patillo.*

wished to criminalize. This militates strongly against applying *Patillo*, *Kosma*, or any § 871 case to the interpretation of intent under § 115(a)(1)(B). Thus, I conclude that intent to retaliate within the meaning of § 115(a)(1)(B) can exist only when the speaker intends that his threat be communicated to its object. In sum, it is the conveyance of the threat to the victim—and the fear and apprehension such a communication carries with it—which constitutes the retaliation.[13]

Accordingly, because there is no evidence that Fenton intended his threat to be communicated to Congressman Murtha, he could not have had an intent to retaliate within the meaning of § 115.

Fenton's conviction cannot stand, and an appropriate order follows.

### *ORDER*

AND NOW, this 22nd day of December 1998, upon consideration of defendant's motion in open court for judgment of acquittal under Fed.R.Crim.P. 29, dkt. no. 124, his brief in support and the government's response thereto, it is hereby

ORDERED and ADJUDGED that the aforesaid motion is GRANTED. The jury verdict is SET ASIDE and the defendant, Donald Lee Fenton, is adjudged ACQUITTED as to Count I of the indictment. The Clerk of Court shall mark this criminal case CLOSED.

**13.** If the threat is not communicated, but is carried out, prosecution will lie under 18 U.S.C. § 1114 in any event. If it is neither communicated nor carried out, the putative victim has suffered no harm that could amount to retaliation as that word is normally used.