PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.                                          No. 01-4496

KENNETH ROBERT SPRING,
         *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CR-00-168-F)

Argued: June 6, 2002

Decided: September 26, 2002

Before WIDENER and WILKINS, Circuit Judges, and
Frederick P. STAMP, Jr., United States District Judge for the
Northern District of West Virginia, sitting by designation.

Affirmed in part and vacated and remanded in part by published opinion. Judge Wilkins wrote the majority opinion. Judge Widener wrote an opinion concurring in part and dissenting in part. Judge Stamp wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant. Yvonne Victoria Watford-McKinney, Assistant United States Attorney, Raleigh, North Caro-

lina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Raleigh, North Carolina, for Appellant. John Stuart Bruce, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

## OPINION

WILKINS, Circuit Judge:

Kenneth Robert Spring appeals his sentence for making unlawful threats, *see* 18 U.S.C.A. § 115(a)(1) (West 2000). He asserts that the district court erred by enhancing his offense level for making more than two threats and by departing upward without providing notice of its intent to do so. We affirm the enhancement but vacate and remand for further proceedings concerning the departure.

### I.

In 1999, Spring completed a prison sentence for a prior federal offense and began serving a term of supervised release. Jeffrey W. Naber was appointed to act as his probation officer. After Naber found numerous weapons in a rented storage unit in which Spring was living, the district court revoked Spring's supervised release and returned him to prison.

While in prison, Spring attempted to mail Naber a letter ("the Letter") threatening to kill him along with his wife and daughter, the judge who had revoked Spring's supervised release, Chelsea Clinton, Hillary Rodham Clinton, and "every cop I can get my hand on." J.A. 29 (internal quotation marks omitted). As a result of the Letter, Spring was charged with threatening to murder a federal law enforcement officer, *see* 18 U.S.C.A. § 115(a)(1)(B); threatening to murder a federal judge, *see id.*; and threatening to murder a member of the immediate family of a federal law enforcement officer, *see* 18 U.S.C.A. § 115(a)(1)(A).

At trial, Spring's former cellmate, Clarence Sargent, testified that Spring said he "resented his probation officer so much that he wanted to do something to him." J.A. 253. Sargent explained:

Well, he didn't want to get out of jail, but if he did get out of jail he figured that he could do something to him, hurt him, hurt his family or, you know, to get put back in jail and it would all equal out, you know. That's his thinking, or that's how he related to me that he would get justice by retaliating himself.

*Id.* Another inmate, Michael Williams, recounted similar hostile comments about Naber:

> Q. And what did Mr. Spring tell you about his probation officer?
>
> A. That he never wanted . . . to get out and be underneath the same probation officer. He didn't like him.
>
> Q. Did he tell you why he didn't like his probation officer?
>
> A. That he set him up. That his probation officer set him up and that's why he came back to prison and always harassing him and stuff.
>
>    . . . .
>
> Q. Did he tell you anything else about his dislike of his probation officer?
>
> A. It was bad enough where he wanted to kill him, you know.
>
> Q. Did he say that?
>
> A. Yes, Ma'am.

*Id.* at 301; *see id.* at 302-03 (Williams testifying that he observed Spring writing down plans to rape and kill Naber's children). Williams further testified that Spring inquired about buying a handgun on the black market.

Spring was convicted on all counts. The ensuing presentence report (PSR) assigned Spring a total offense level of 20, based in part on a two-level enhancement for making more than two threats. *See U.S. Sentencing Guidelines Manual* § 2A6.1(b)(2) (2000). The PSR stated that this enhancement applied because the Letter itself contained multiple threats against Naber. The district court imposed the enhancement, noting that Spring had made other threats in conversations with Sargent and Williams.

The PSR also placed Spring in Criminal History Category (CHC) IV but noted that an upward departure might be appropriate "[b]ased upon the defendant's three prior convictions for similar conduct." J.A. 372. Neither this possibility nor any other ground for departure was mentioned during the proceedings concerning objections to the PSR, Spring's allocution, or final arguments by counsel. Nevertheless, when the district court announced its judgment, it stated that CHC IV "fails to capture the likelihood that [Spring] will commit further crimes," *id.* at 337, and departed upward to CHC V. Immediately after announcing this departure, and without having asked for or received comment from counsel, the court sentenced Spring to 78 months imprisonment. Spring then objected to the "sua sponte upward departure." *Id.* at 342. The court responded that the PSR had provided adequate notice of possible grounds for departure. The court did not then invite Spring to offer arguments against such a departure, nor did Spring attempt to offer any.

## II.

Spring first challenges the two-level enhancement for making more than two threats. He asserts that his statements to his fellow inmates were not threats within the purview of § 115(a)(1) because he did not communicate or intend to communicate them to their target, Naber. We conclude that the enhancement was proper.

Section 115(a)(1) prohibits, *inter alia*, making threats against certain federal officials to influence their future actions or to retaliate against them for past actions. According to Spring, this offense logically requires that the threats be communicated to their intended targets, as a threat cannot affect its victim unless the victim is aware of it. *See United States v. Fenton*, 30 F. Supp. 2d 520, 528-30 (W.D. Pa.

1998). *But see United States v. Martin*, 163 F.3d 1212, 1216-17 (10th Cir. 1998); *United States v. Snelenberger*, 24 F.3d 799, 803 (6th Cir. 1994). We need not decide this question, however, because the relevant provision here is U.S.S.G. § 2A6.1(b)(2), not 18 U.S.C.A. § 115(a)(1).

Section 2A6.1 governs sentencing for crimes involving threats or harassing communications. Under § 2A6.1(b)(2), the offense level for such crimes is subject to a two-level increase "[i]f the offense involved more than two threats." Neither the guideline nor its commentary defines the word "threat." The guideline does, however, list numerous crimes to which it applies, including threatening the President, *see* 18 U.S.C.A. § 871 (West 2000), and mailing threatening communications, *see* 18 U.S.C.A. § 876 (West 2000). *See* U.S.S.G. § 2A6.1, comment. The cases interpreting these and similar statutes tend to give the term "threat" the same meaning without regard to the offense of conviction. *See, e.g.*, *United States v. Francis*, 164 F.3d 120, 122 (2d Cir. 1999) (interpreting 18 U.S.C.A. § 875(c) (West 2000) in accord with precedents pertaining to § 871 and 18 U.S.C.A. § 879(a) (West Supp. 2002)). In light of this statutory context, we conclude that the term "threat" has the same meaning in § 2A6.1(b)(2) that it has in statutes criminalizing threats.

The contours of this generic definition have never been expressly delineated, but the cases provide much guidance. For example, this court has held that in order to avoid punishing constitutionally protected speech not amounting to a "true threat," the prosecution must prove that "an ordinary, reasonable [person] who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Maxton*, 940 F.2d 103, 106 (4th Cir. 1991) (internal quotation marks omitted). We have also held that a statement may qualify as a threat even if it is never communicated to the victim. *See United States v. Patillo*, 431 F.2d 293, 295-96 (4th Cir. 1970) (holding that statements to co-worker expressing desire to kill President constituted true threats for purposes of § 871), *aff'd on reh'g en banc*, 438 F.2d 13 (4th Cir. 1971); *see also United States v. Siegler*, 272 F.3d 975, 978 (7th Cir. 2001) (upholding § 876 conviction based on letter to defendant's associate instructing him to murder prosecution witness); *United States v. Geisler*, 143 F.3d 1070, 1071-72 (7th

Cir. 1998) (upholding § 876 convictions for sending letters that victim never read).

We do not hold that the failure to communicate a threat to its intended victim is entirely irrelevant. In a particular case, whether a threat was communicated to the victim may affect whether the threat could reasonably be perceived as an expression of genuine intent to inflict injury. *Cf. Patillo*, 431 F.2d at 297-98 (distinguishing among threats against President based on whether they were transmitted (or were intended to be transmitted) to President or to third party). Or, as Spring argues with respect to § 115(a)(1), communication of the threat to the intended victim may be essential to consummation of the crime. In that event, however, the communication requirement would arise from the other elements of the offense; it would not inhere in the term "threat."

It follows that Spring's statements to Sargent and Williams may be treated as threats even though Spring did not communicate them or intend to communicate them to Naber. Although the statements might not support separate convictions under § 115(a)(1) (a question we do not decide), § 2A6.1(b)(2) does not incorporate any element of that offense beyond the generic statutory definition of the term "threat." We therefore affirm the application of § 2A6.1(b)(2) by the district court.[1]

### III.

Spring next contends that the district court erred in departing upward from CHC IV to CHC V without giving prior notice of its intent to do so. We agree.

---

[1]In his partial dissent, Judge Stamp states that the record fails to demonstrate either that Spring had a "genuine intent to inflict injury" upon Naber or that he intended "to effect some change or to achieve some goal through intimidation." *Post*, at 10. The question of whether Spring intended to carry out his threats has not been raised; on the contrary, Spring expressly asserts that the presence or absence of such intent is not relevant to his claims. *See* Br. for Appellant at 24. As for the intent to intimidate or cause change, proof of such intent may be required for a conviction under § 115(a)(1), but it is not a prerequisite to the application of U.S.S.G. § 2A6.1(b)(2).

At the outset, we have some question about whether this claim was properly preserved. Spring could not have objected to the departure prior to the imposition of sentence except by interrupting the district court, a practice we do not encourage. After the court announced its sentence, however, Spring could have objected to the lack of opportunity to comment, either at the hearing itself or in a subsequent motion to correct the sentence pursuant to Fed. R. Crim. P. 35(c).[2] He did object at the hearing, but only to the "sua sponte" nature of the departure. J.A. 342. It is questionable whether that objection sufficed to embrace his current objection to the failure to afford an opportunity to comment.

It is not necessary for us to resolve this issue. If there was no proper objection, either at the hearing or in a post-hearing motion, then this claim must be reviewed for plain error. *See United States v. Fant*, 974 F.2d 559, 562 (4th Cir. 1992). To establish plain error, Spring

> must demonstrate that an error occurred, that the error was plain, and that the error affected his substantial rights. Even if [Spring] can satisfy these requirements, correction of the error remains within our discretion, which we should not exercise unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Promise*, 255 F.3d 150, 154 (4th Cir. 2001) (en banc) (citation, alterations, and internal quotation marks omitted), *cert. denied*, 122 S. Ct. 2296 (2002). We hold that Spring's sentence must be vacated even under this exacting standard. *See United States v. Perkins*, 108 F.3d 512, 516 (4th Cir. 1997) (declining to resolve preservation question where reversal was required even under plain error standard).

---

[2]Under Rule 35(c), the district court may correct a sentence only if it "was imposed as a result of arithmetical, technical, or other clear error." As we will explain, the decision to depart without first hearing from counsel amounted to plain error. It follows that the decision was also "clear error" under Rule 35(c). *See United States v. Ward*, 171 F.3d 188, 191 (4th Cir. 1999) (holding that clear errors under Rule 35(c) are errors that would almost certainly result in reversal on appeal).

Initially, we conclude that error occurred. A district court "must afford counsel for the defendant and for the Government an opportunity to comment on . . . matters relating to the appropriate sentence." Fed. R. Crim. P. 32(c)(1). The court here denied the parties sufficient opportunity to comment by failing to inform them that it was contemplating an upward departure.

There was no defect in pre-hearing notice here; the PSR provided notice that a departure to a higher CHC might be considered at the sentencing hearing. *See Burns v. United States*, 501 U.S. 129, 138 (1991). This notice informed counsel that they needed to *prepare* arguments on this issue, but not that they needed to *present* them. Although Spring could have offered his arguments preemptively, it is fully understandable why his attorney would not want to call attention to the possibility of an upward departure. *See Burns*, 501 U.S. at 137. Moreover, it would not serve the interests of judicial economy to encourage counsel to comment on all potential grounds for departure identified in the PSR, as many ultimately have no bearing on the sentence. *Cf. id.* (stating that requiring counsel to anticipate all possible grounds for departure that might be considered would result in "random and wasteful" examination of issues). Here, for example, the PSR noted four possible grounds for departure; if Spring had offered reasons why none of these grounds should apply, his comments regarding three of them would surely have been a waste of time.

By the time the parties received notice that an upward departure was under consideration, the court had already made a final ruling on the issue. The court did not solicit arguments from counsel before announcing this ruling. Thus, the sole option left to Spring was to request reconsideration of a decision that had already been announced and incorporated in a judgment. This is not equivalent to proper adversarial process before a decision is reached; on the contrary, once a sentence is announced, both the specific constrictions of Rule 35(c) and the general inertia of the decision-making process impose substantial burdens on a party seeking to modify a sentence. We therefore hold that error occurred when the district court departed upward without soliciting the views of the parties beforehand.

The remaining three requirements of the plain error test are also satisfied here. The error was plain because the decision to depart

upward without comment from the parties violated the clear direction of Rule 32(c)(1). And, the error resulted in an increased sentence and therefore affected substantial rights. *Cf. Promise*, 255 F.3d at 160-61 (discussing application of "substantial rights" prong of plain error test). Finally, the error should be noticed and corrected because it impaired Spring's opportunity to be heard on an important matter affecting his sentence and because his arguments against the upward departure have sufficient weight that the district court, in the exercise of its broad discretion, might accept them when Spring has a chance to present them.

In light of these considerations, we vacate Spring's sentence and remand to allow the district court to consider an upward departure after hearing argument from the parties. We take no position regarding the merits of such a departure.

### IV.

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings.

*AFFIRMED IN PART; VACATED*
*AND REMANDED IN PART*

WIDENER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion as it relates to the two-level enhancement of Spring's offense level under § 2A6.1(b)(2) of the Sentencing Guidelines for making more than two threats. I respectfully dissent, however, with respect to Section III of the majority opinion and would affirm the district court's upward departure. I think the notice in the pre-sentence report was adequate.

STAMP, District Judge, concurring in part and dissenting in part:

While I concur with the ruling expressed in Section III of the majority opinion regarding the lack of adequate notice leading to the district court's upward departure, I respectfully dissent from the

majority view that affirms the two-level enhancement of Spring's offense level under U.S.S.G. § 2A6.1(b)(2) for the making of more than two threats, arrived at by including the statements made by Spring to three prison inmates, Wayne Alderman, Clarence Sargent and Michael Williams. These statements would include verbal comments made at different times by Spring to the three inmates, statements made on a typewriter ribbon or tape found by Sargent and typed by Spring, and statements written by Spring on the back of a prison form and found by Williams.

The record shows that none of these statements were communicated to Probation Officer Naber. While this Court has held in certain cases that a statement may constitute a threat even if it is not communicated, Judge Wilkins correctly notes that the majority opinion in this case does not "hold that the failure to communicate a threat to its intended victim is entirely irrelevant. In a particular case, whether the threat was communicated to the victim may affect whether the threat could reasonably be perceived as an expression of genuine intent to inflict injury." I agree with that statement but dissent because I believe that under the particular facts in this case, a reasonable person would not conclude that Spring's comments to his fellow inmates or the statements contained on the typewriter tape or the back of the prison form, although reprehensible, were expressions of genuine intent to inflict injury upon the intended victim. Here, there was no connection between the inmates and the intended victim. Further, there was no request by Spring, expressed or implied, that any inmate communicate, either directly or indirectly, the statements to the intended victim. *See United States v. Bellrichard*, 779 F.Supp. 454 (D. Minn. 1991), *aff'd*, 994 F.2d 1318 (8th Cir. 1993). Consequently, I do not believe that Spring's statements to or found by the inmates can be construed to be "true threats" as required under *Watts v. United States*, 394 U.S. 705 (1969). Spring's statements to the three inmates and the message on the tape or paper would not, in my opinion, cause a reasonable person to believe that they were conveyed to the inmates to effect some change or to achieve some goal through intimidation. *See United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997); *United States v. Fenton*, 30 F.Supp.2d 520 (W.D. Pa. 1998). At least there is insufficient evidence of such intention in the record. J.A. 219-268. Indeed, there is no evidence that Spring intended that the tape or paper be seen by the inmates. Stated another way, Spring's statements

testified to by the three prison inmates differ dramatically from the statements contained in the letter from Spring addressed to "Jeff Nabers, U.S. Probation" and intercepted on May 22, 2000 by the Federal Bureau of Prisons' personnel which letter was the basis of the three-count indictment against Spring and upon which he was convicted, and which statements were definitely true threats. J.A. 355-56.